Herbert X. BLYDEN, on behalf of himself and all others similarly situated; Peter Butler, on behalf of himself and all others similarly situated; Charles 'Flip' Crowley, on behalf of himself and all others similarly situated; Kendu Haiku, also known as Willie Stokes, on behalf of himself and all others similarly situated; Calvin Hudson, on behalf of himself and all others similarly situated; Johnnie Barnes, as the Administrator of the goods, chattels, and credits which were of John Barnes, deceased, on behalf of himself and all others similarly situated; Joseph Little, on behalf of himself and all others similarly situated; Kimanthi Mpingo, also known as Edward Dingle, on behalf of himself and all others similarly situated; George 'Che' Nieves, on behalf of himself and all others similarly situated; Jomo Joka Omowale, also known as Eric Thompson, on behalf of himself and all others similarly situated; Robin Palmer, on behalf of himself and all others similarly situated; Akil Al-Jundi, also known as Herbert Scott Deane, on behalf of himself and all others similarly situated; Alfred Plummer, on behalf of himself and all others similarly situated; Ooji Kwesi Sekou, also known as Chris Reed, on behalf of himself and all others similarly situated; Jerome Rosenberg, on behalf of himself and all others similarly situated; Elizabeth Durham, Mother and Legal Representative of Allen Durham, deceased, on behalf of him/herself and all others similarly situated; Litho Lundy, Mother and Legal Representative of Charles Lundy, deceased, on behalf of him/herself and all others similarly situated; Theresa Hicks, Widow and Legal Representative of Thomas Hicks, deceased, on behalf of him/herself and all others similarly situated; Alice McNeil, Mother and Legal Representative of Lorenzo McNeil, deceased, on behalf of him/herself and all others similarly situated; Maria Santos, Mother and Legal Representative of Santiago Santos, deceased, on behalf of him/herself and all others similarly situated; Laverne Barkley, Mother and Legal Representative of L.D. Barkley, deceased, on behalf of him/herself and all others similarly situated; Vernon Lafranque, on behalf of himself and all others similarly situated; James B. Murphy, also known as 'Red' Murphy, on behalf of himself and all others similarly situated; Thomas Louk, on behalf of himself and all others similarly situated; Wiliam Maynard, Jr., on behalf of himself and all others similarly situated; Phillip 'Wald' Shields, on behalf of himself and all others similarly situated; Alphonso Ross, on behalf of himself and all others similarly situated; Frank Lott, on behalf of himself and all others similarly situated; Gary Richard Haynes, on behalf of himself and all others similarly situated; Raymond Sumpter, on behalf of himself and all others similarly situated; Omar Sekou Toure, also known as Otis McGaughey, on behalf of himself and all others similarly situated; Dacajeweiah, also known as John Hill, on behalf of himself and all others similarly situated, Plaintiffs,

Big Black, also known as Frank Smith, on behalf of himself and all others similarly situated; David Brosig, Plaintiffs–Appellees,

v.

Vincent MANCUSI; John S. Keller, as Administrator of the Estate of John Monahan; Kurt G. Oswald, as Administrator of the Estate of Russell G. Oswald, Defendants,

Karl Pfeil, Defendant–Appellant.

No. 97–2912.

United States Court of Appeals, Second Circuit.

Argued July 16, 1998.

Decided Aug. 3, 1999.

Elizabeth M. Fink, Brooklyn, New York (Michael E. Deutsch, People's Law Office, Chicago, Illinois; Ellen M. Yacknin, Greater Upstate Law Project, Inc., Rochester, New York; Daniel Meyers, New York, New York; Dennis Cunningham, San Francisco, California; Joseph J. Heath, Syracuse, New York; Frank B.B. Smith, *pro se*, Brooklyn, New York, of counsel), for Plaintiffs–Appellees.

Mitchell J. Banas, Jr., Jaeckle Fleischmann & Mugel (Randy C. Rucinski, Charles J. Scibetta, Jr., of counsel), Buffalo, New York, for Defendant–Appellant.

Before: WINTER, Chief Judge, POOLER, Circuit Judge, and DORSEY, District Judge.*

WINTER, Chief Judge:

This appeal arises out of a class action for civil rights violations brought by prisoners after the riot in Attica prison in 1971. Karl Pfeil, a former Assistant Deputy Superintendent at Attica, appeals from judgments in favor of Frank Smith and David Brosig.

Plaintiffs instituted this class action twenty-five years ago against Pfeil and other New York State officials and corrections personnel, based on the various de-

* The Honorable Peter C. Dorsey, of the United States District Court for the District of Connecticut, sitting by designation.

fendants' roles during and subsequent to the 1971 Attica prison riot. The amended complaint asserted claims under 42 U.S.C. § 1983 for violations of the inmates' constitutional rights during and after the prison retaking. The case was assigned to Judge Elfvin, who certified a class action and bifurcated the case into liability and damages phases. The liability trial appears to have been intended to have the jury resolve each defendant's liability or non-liability to the entire class. The damages phase was to proceed with new juries determining the damages suffered by each individual plaintiff. After a jury found appellant liable in the liability phase, two juries in the damages phase awarded Smith and Brosig $4 million and $75 thousand, respectively.

The lynch-pin of the liability award was a verdict sheet that on its face did not require findings sufficient to support class-wide liability or even liability to particular, identifiable plaintiffs. Absent a valid finding of liability, the damage awards to Smith and Brosig must be reversed. Moreover, appellant's Seventh Amendment right to a jury trial was violated by allowing the damages phase juries to revisit many of the same issues as were considered by the liability jury. We therefore reverse both the liability and damages verdicts.

## BACKGROUND

### a) *Underlying Events*

This appeal arises out of events that followed the forceable retaking of Attica prison from riotous inmates in 1971. The case did not reach a final judgment, however, until 1997—fully twenty-three years after it was filed. We set forth the facts directly relevant to this appeal; more detailed accounts of the events following the Attica riot can be found in *Al–Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1062–64 (2d Cir.1989), and *Inmates of Attica Correctional Facility v. Rockefeller*, 453 F.2d 12, 15–19 (2d Cir.1971) [*Inmates of Attica*].

On September 9, 1971, more than 1200 inmates of Attica seized control of substantial portions of the facility and took numerous hostages. While part of the prison was retaken that same day, prisoners remained in control of an area known as the D Yard. They remained there for the next several days, as authorities and representatives of the inmates attempted to negotiate a restoration of state control. Negotiations failed, and then-Governor Nelson A. Rockefeller authorized then-Corrections Commissioner Russell G. Oswald to order the State Police forceably to retake the D Yard. The subsequent retaking resulted in the deaths of ten hostages and twenty-nine prisoners.

There is very substantial evidence that, following the retaking, some, and perhaps most or even all, of the D Yard inmates were the victims of brutal acts of retaliation by prison authorities. Among those who testified for the plaintiffs at trial were numerous non-inmate witnesses, including seven National Guard personnel who entered the prison shortly after the retaking.

The inmates in D Yard were forced to strip naked and lie down on the ground. Later, there were at least two gauntlets through which the naked and barefoot prisoners were forced to proceed, one at a time, across broken glass, while being beaten by baton-wielding corrections officers and subjected to threats and racial slurs. *See Inmates of Attica*, 453 F.2d. at 16. Prisoners who were identified as having played a significant role in the riot were singled out for additional and more egregious punishment, including torture. *See id.* at 18–19. For example, Smith was forced to lie on a table while officers brutally beat and burned him. During this time, he was forced to hold a football against his throat with his chin and was told that he would be killed if it fell.

There was also evidence of numerous random acts of violence against prisoners. One prisoner, who had two fractured femurs, was being returned to the E housing

unit on a gurney when corrections officers dumped him onto the ground. He was told to crawl back to his cell but was unable to do so. Officers were then observed repeatedly shoving a screw-driver into the injured prisoner's anus. There was other testimony of numerous instances of outrageous behavior, including corrections officials playing "Russian roulette" with jailed inmates.

### b) Pre–Trial Proceedings

Plaintiffs' complaint, filed on September 13, 1974, and amended on September 11, 1975, alleged widespread violations of the inmates' constitutional rights by numerous state officials before, during, and after the retaking and sought class-action certification. The defendants opposed certification and, on September 19, 1975, filed a motion to dismiss. More than four years later, on October 31, 1979, the district court dismissed certain claims and certain defendants. At the same time it certified a plaintiff class consisting of those prisoners who were in the D yard during the riot and the retaking of the prison.

The ensuing year was lost to turnover among class counsel, as a result of which the plaintiffs failed to commence discovery in a timely fashion. In November 1980, the district court determined that the named plaintiffs "are not adequate representatives for the [class]" and accordingly decertified the class and conditionally dismissed the action "unless plaintiffs shall have commenced discovery ... within 120 days of the entry of this [order]." Approximately three months later, plaintiffs' current counsel entered the case and filed comprehensive discovery requests, thereby avoiding dismissal of the action.

Discovery was litigious, but plaintiffs nevertheless completed their discovery in late 1984. Defendants, who had made no attempt at discovery, then filed a motion for discovery and inspection of documents. Ultimately, the parties stipulated to December 3, 1985, as the date for the completion of discovery and further agreed that any request for extension must be made by November 3, 1985. Nevertheless, defendants moved on December 2, 1985, for an indefinite stay of the proceedings so they might continue discovery. On April 21, 1986, the court granted defendants an additional 135 days to complete discovery.

In August 1987, the Estate of Nelson Rockefeller filed a motion for summary judgment on the basis of qualified immunity. The court granted the Rockefeller motion in September 1988 and gave the remaining defendants until July 1989 to file their own motions. We affirmed the dismissal of the Rockefeller Estate on September 15, 1989. See Al–Jundi, 885 F.2d 1060. At this time, however, the remaining defendants still had not filed motions for summary judgment based on qualified immunity. On December 11, 1989, plaintiffs sought an immediate trial date. Defendants opposed this request and asked for additional time to file summary judgment motions. Shortly thereafter, the trial court scheduled the trial for June 5, 1990.

In March 1990, the remaining defendants filed motions for summary judgment based on qualified immunity. The district court denied summary judgment, and an appeal followed. We affirmed the denial in part as to Oswald, Vincent Mancusi (former Superintendent of Attica), and Pfeil on February 27, 1991. See Al–Jundi v. Mancusi, 926 F.2d 235 (2d Cir.1991). The Eighth Amendment claims that ultimately were permitted to go to trial were against Oswald, for failure to plan for medical needs in connection with the plan of retaking; against John Monahan, for his role in supervising the State Police officers who participated in the retaking; and against Oswald, Mancusi, and Pfeil, all for failure to prevent the acts of retaliation that took place subsequent to the prison retaking. Only the claim as against Pfeil is at issue on this appeal.

### c) Liability Phase

Jury selection in the liability phase began on October 15, 1991.

The claim against Pfeil was not predicated on his direct participation in any acts of retaliation but solely on his actions and inactions as a supervisor. Evidence, including the testimony of Pfeil's immediate superiors, indicated that Pfeil was one of two supervisory officials specifically responsible for preventing acts of retaliation. Plaintiffs contended that Pfeil not only failed to carry out his duties in this respect but also condoned the retaliation. There was testimony that Pfeil witnessed but did nothing to stop, or even to report the occurrence of, multiple brutal beatings. Further, Pfeil decided to go home in the period immediately following the retaking, when the risk of violence was high. Plaintiffs portrayed this decision as supporting liability while Pfeil used it to distance himself from responsibility for the events that took place in his absence.

Further evidence indicated that supervisory officials, including Pfeil, were aware of, but did nothing to correct, misconceptions among corrections officers regarding the treatment of hostages during the riot. Rumors were about that the ten hostages who died in the retaking were brutally tortured and killed by inmates. The reality was that all the hostages died as a result of "friendly fire" from the retaking force.

The jury's deliberations were structured by the court as follows. The jury had to determine whether "reprisals" had been committed after the Attica retaking. "Reprisals"—in this case a term of art—were defined as "any act of retaliation" undertaken by officers or officials that met the standards for Eighth Amendment liability as cruel and unusual punishment. If the jury found that "reprisals" had occurred, it then had to determine whether any of the defendants caused "such reprisals." Of course, if no "reprisals" occurred, there could be no liability for causing them.

The district court instructed the jury that the standard for determining Eighth Amendment liability is wantonness, but "[t]he state of mind that satisfies the re-

quirement that the physical abuse be wantonly inflicted is not fixed. What constitutes a wanton state of mind must be determined in light of the circumstances surrounding the infliction of abuse." It continued:

> In the case of officials acting in an emergency situation ... a wanton state of mind consists of acting maliciously or sadistically, for the very purpose of causing harm, rather than acting with good faith in an effort to restore order.
>
> . . . .
>
> In contrast, where officials are not acting in an emergency situation, a requisite state of mind consists of acting with wanton and deliberate indifference.
>
> . . . .
>
> A defendant can be thus liable to the plaintiffs if he acted himself or failed to take action to stop such violations by others, provided that he had the ability to stop such violations.

Thus, the court instructed the jury to determine whether the circumstances alleged were riotous, were not riotous, or were somewhere in between, and then to apply either a sadistic and malicious standard, a deliberate indifference standard, or some hybrid of the two.

The court explained to the jury that the case was a class action, meaning "[a]ny decision that you reach will apply to any of the members of the class as to whom cruel and unusual punishment has according to your finding been proximately inflicted upon them wantonly by any particular defendant." With respect to plaintiffs' claim against Pfeil *et al.* for "fail[ure] to prevent reprisals against the plaintiffs subsequent to the forcible retaking of the facility," the court instructed the jury that if it found "Mr. Pfeil inflicted cruel and unusual punishment upon some or all of the plaintiffs," it should "return a verdict in their favor against Mr. Pfeil."

As noted, the verdict sheet given to the jury plays a critical role in our decision. In pertinent part it read:

(A) Have the plaintiffs proven by the preponderance of the pertinent evidence that, after the retaking and liberation but prior to the time when the plaintiffs had been relocked in cells, officers engaged in reprisals constituting cruel and unusual punishment against the plaintiffs or any of them by using unnecessary or excessive force?

(B) If your answer to Question (A) is "yes," have the plaintiffs proven by the preponderance of the pertinent evidence that Karl Pfeil personally engaged in any such reprisals or directed or ordered that there be such reprisals or knew (or intentionally did not know) or was wantonly and deliberately indifferent to whether there were any such reprisals and did not do all that he reasonably could to stop or prevent such reprisals so that he should be held liable to the plaintiffs or any of them for any injury or other harm proximately resulting from such reprisals? [1]

At the charge conference, Oswald's counsel objected to several matters in the verdict sheet. These included a claim that (A)'s description of the officers for whose behavior Oswald might be liable was overbroad because it encompassed persons not in the correctional system's chain of command, *e.g.*, state troopers. He also objected to the use of the word "reasonably" in (B) as not accurately describing the applicable standard of Eighth Amendment liability. Finally, he objected to the "[p]laintiffs, or any of them" language in (A) and (B). This last objection was on the ground that the term "plaintiffs or any of them" was not sufficient to establish class-wide liability. Pfeil's counsel did not present additional objections but attempted to join in Oswald's objections.

On the excessive force claim, the jury found Pfeil liable, answering "yes" to questions (A) and (B).[2] None of the remaining defendants was found liable.[3]

d) *Damages Phase*

After the verdict was returned against Pfeil, settlement negotiations were undertaken, but they broke down in November 1992. In January 1993, the district court denied Pfeil's post-trial motions. Because liability was joint and several and damages would, in any event, be paid by the State, the court encouraged plaintiffs to focus on their claims against Pfeil in order to facilitate the fashioning of an appealable final judgment. However, despite the court's willingness to certify an appeal from the liability verdict, defense counsel opted to wait until final damage judgments were entered before appealing. *See, e.g., Al–Jundi v. Oswald,* No. 75–CV–0132E(M), 1996 WL 662866 at *2 n. 4 (W.D.N.Y. Nov. 7, 1996) (Memorandum and Order).

Over the next two years, the court and the parties focused on the structuring of representative damage trials. Subclasses were considered and "typical" plaintiffs were selected. In August 1994, the court scheduled two damage trials, one to begin on October 31, 1994, and the other on November 14, 1994. Appellant's counsel refused to stipulate that Pfeil had been found liable to the class, contending that the "plaintiffs or any of them" language in the 1992 verdict sheet did not establish appellant's class-wide liability. The court, apparently unsure how to proceed, then postponed *sua sponte* the damage trials.

---

**1.** The verdict sheet also contained questions, identical in form to the foregoing, as to the occurrence of constitutional violations and defendant Pfeil's liability with respect to the period after plaintiffs had been relocked in their cells.

**2.** The jury also answered "yes" as to Pfeil's liability for the period after plaintiffs had been locked into their cells.

**3.** The jury failed to reach verdicts as to defendants Oswald or Mancusi on the failure-to-prevent-reprisals count on which it found Pfeil liable. No defendant was found liable on any other count. On the "failure to provide adequate medical care following the retaking" claim against Oswald, the jury found an Eighth amendment violation but did not hold Oswald responsible.

On November 17, 1994, the district court again noted that an interlocutory appeal was the appropriate course; again appellant's counsel declined the offer to certify an appeal. Plaintiffs unsuccessfully sought a ruling on class-wide liability from which, if such liability was denied, they might appeal. Finally, on May 2, 1995, the court, apparently concluding that class-wide liability had not been established, proposed to de-certify the class and hold individual trials for each plaintiff. Plaintiffs sought a writ of mandamus from this court, which was denied on June 30, 1995, without prejudice to renewal if the district court did not immediately schedule damage trials. The district court then scheduled damages trials in which it apparently intended to permit Pfeil to contest his liability to individual plaintiffs for "reprisals." As a result, plaintiffs moved for reconsideration of their mandamus petition. Before our decision on that motion, the district court altered its position, opining that "prima facie [the liability-trial verdict] must be construed as imposing an all-encompassing responsibility upon Pfeil but allowing him to tender, but not necessarily to adduce, evidence that some particular hurt or deprivation from reprisals was so 'out-of-the-mainstream' ... as to be beyond Pfeil's responsibility." On November 16, 1995, we denied the motion for reconsideration of the mandamus petition. The district court then scheduled damages trials for Smith and Brosig, the former to begin on May 29, 1997.

Smith was perhaps the most brutalized of all the plaintiffs and represented the high end of the range of damages an individual plaintiff could expect to be awarded at trial. Brosig, by contrast, was selected because his claims were typical of the majority of class-members who were neither singled out for extra retaliation nor especially injured. The two trials were conducted in May and June, 1997.

At the Smith damages trial, the court instructed the jury:

[I]t has been found and you must take as true that certain acts were done by those Officers without their being reasonably justified by the circumstances, and such are what we have called and are calling reprisals. And that Mr. Pfeil ... personally is responsible for any and all injury and harm, physical and/or mental, caused by such reprisals. Accepting, as you must, that there were acts of reprisals, you must determine whether this plaintiff, Mr. Smith, suffered and/or suffers and/or will suffer the effects of such.... Also you must extend to these Officers a degree of leniency and tolerance in judging whether any particular act was a reprisal. It might or not have been completely justified under the then circumstances to make all inmates take off all of their clothes or to lie on the ground or to be funneled through lines of Officers so to go to their cells, but more than what was needed and justified in any or all of that was done by some Officers to some inmates and each of such inmates thereby suffered from a reprisal and is entitled to recover therefore from Mr. Pfeil....

The court's jury instruction at the Brosig damages trial was similar to that quoted above, except that it also instructed the jury, at Pfeil's request, that Pfeil would not be liable "for some solitary and unrepeated act or omission by some renegade officer."

## DISCUSSION

Appellant makes four principal arguments on appeal: (i) the court misstated the Eighth Amendment culpability standard in its jury instructions; (ii) the liability-jury's verdict did not establish class-wide liability; (iii) the bifurcated trials violated the Seventh Amendment by allowing the damages juries to reexamine issues decided by the liability jury; and (iv) the district court erred in certifying this case as a class action. Appellant also challenges the district court's evidentiary rulings and jury instructions in both damages

trials and contends that the Smith verdict was excessive as a matter of law. We disagree with appellants' view of the standard of liability under the Eighth Amendment but hold that the jury verdict in the class liability phase failed to establish Pfeil's class-wide liability. Moreover, the method of bifurcation used violated the Seventh Amendment. We also believe that the district court should reconsider whether further proceedings should be on a class-wide basis. We therefore reverse and remand. In light of our holding, we do not reach appellant's claims of error with respect to the Smith and Brosig damages trials.

### a) *Eighth Amendment Liability Under Section 1983*

Appellant contends that the district court erred in charging the jury that, under the Eighth Amendment, he might be held liable for conduct that amounted only to "deliberate indifference," rather than for conduct that was "sadistic and malicious."

■ The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, *see Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), prohibits the infliction of "cruel and unusual punishments." U.S. Const. Amend. VIII. " '[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.' " *Helling v. McKinney*, 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)).

■ The appropriate test under the Eighth Amendment involves both subjective and objective elements. *See Wilson v. Seiter*, 501 U.S. 294, 298–99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir.1994). The subjective element is that the defendant must have had the necessary level of culpability, shown by actions characterized by "wantonness." *Wilson*, 501 U.S. at 298–99, 111 S.Ct. 2321 (citing *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). The objective element is that the injury actually inflicted must be sufficiently serious to warrant Eighth Amendment protection. *See id.* at 298, 111 S.Ct. 2321. With respect to the subjective element, the definition of "wantonness" varies according to the circumstances alleged. *See Davidson*, 32 F.3d at 30 n. 2. "Furthermore, the wantonness of conduct does not depend upon its effect on the prisoner, but rather 'upon the constraints facing the *official*.' " *Id.* (quoting *Wilson*, 501 U.S. at 303, 111 S.Ct. 2321 (emphasis in original)). As a general matter, it is sufficient to show that a prison official acted with "deliberate indifference" to prisoners' health or safety. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (prisoner-on-prisoner violence); *Helling*, 509 U.S. at 32–35, 113 S.Ct. 2475 (environmental tobacco smoke); *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (prisoners' serious medical needs). The deliberate indifference standard does not require a showing "that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970. Still, this standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability. *Id.* at 841, 114 S.Ct. 1970.

■ However, in excessive force cases, the "wantonness" inquiry turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *see also*

*Davidson,* 32 F.3d at 30 ("The key inquiry under *Hudson* and its precedents is whether the alleged conduct involved 'unnecessary and wanton infliction of pain.'" (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. 995)).

 *Hudson* does not limit liability to that subset of cases where "malice" is present. Rather, *Hudson* simply makes clear that excessive force is defined as force not applied in a "good-faith effort to maintain or restore discipline." 503 U.S. at 7, 112 S.Ct. 995. Because decisions to use force are often made under great pressure and involve competing interests, the good-faith standard is appropriate. See *id.* at 6–7, 112 S.Ct. 995. The Court's use of the terms "maliciously and sadistically" is, therefore, only a characterization of all "bad faith" uses of force and not a limit on liability for uses of force that are otherwise in bad faith.

 Indeed, the deliberate indifference test cannot be used in excessive force cases without altering the meaning of ordinary language. The use of force is always an affirmative act and never passive indifference. One does not normally describe someone as being actively indifferent, let alone actively deliberately so, and the use of the deliberate indifference test in exces-

sive force cases would thus be quite odd. The deliberate indifference test is, by contrast, wholly appropriate in cases where the constitutional deprivation results from inaction in the face of depraved conditions.[4]

 The objective component of the Eighth Amendment test is also context specific, turning upon "'contemporary standards of decency.'" *Hudson,* 503 U.S. at 8, 112 S.Ct. 995 (quoting *Estelle,* 429 U.S. at 103, 97 S.Ct. 285). Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a "conditions-of-confinement" claim. See *id.* at 9, 112 S.Ct. 995. By contrast, certain actions, including the malicious use of force to cause harm, constitute Eighth Amendment violations *per se.* See *id.* ("This is true whether or not significant injury is evident."). This result follows because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.; see also Wilkerson v. Utah,* 99 U.S. 130, 136, 25 L.Ed. 345 (1878) ("[P]unishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden.").

4. Appellant also argues that the jury instructions on the subjective component of Eighth Amendment liability erroneously distinguished between riot and non-riot circumstances. This distinction was suggested by the decision in *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), where the Court focused on the particular problems presented by a prison disturbance. See *id.* at 320, 106 S.Ct. 1078 ("Where a prison security measure is undertaken to resolve a disturbance," the question turns on whether force was applied in good faith or "maliciously and sadistically."). In *Hudson,* the Court eliminated any distinction between "riot" and "normal" circumstances for the purposes of evaluating excessive force claims, even as it denied that its holding effected any change in its Eighth Amendment jurisprudence. See *Hudson,* 503 U.S. at 6–7, 112 S.Ct. 995 (tracing standard to *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.1973)). In essence, the Court declared in *Hudson* that the

necessary *mens rea* for excessive force claims was fixed, but the amount of force that might reasonably have been necessary remains a function of the circumstances. It is for this reason that the Court denied it was working an innovation in its jurisprudence—the riot/non-riot distinction was rejected because the identical inquiry is made when a jury evaluates whether a particular use of force was excessive under the circumstances (with appropriate deference). See *id.* at 5, 112 S.Ct. 995 ("What is necessary to establish an 'unnecessary and wanton infliction of pain' . . . varies according to the nature of the alleged constitutional violation."). To be sure, the district court's statement in the instant matter of the proper Eighth Amendment standard was imperfect—although it plausibly interpreted *Whitley,* it failed to anticipate *Hudson,* which was decided shortly after the liability-phase trial went to the jury. The charge was harmless, however, because "reprisals," as defined, are by definition not in good faith.

Section 1983 provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law. *See* 42 U.S.C. § 1983. Because Section 1983 imposes liability only upon those who actually cause a deprivation of rights, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation and internal quotation marks omitted). For this reason, the doctrine of *respondeat superior* cannot be used to establish liability under Section 1983. *See Monell v. Department of Soc. Servs.,* 436 U.S. 658, 692–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Wright,* 21 F.3d at 501; *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973). However, "Section 1983, which merely provides a cause of action, 'contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right.'" *Farmer,* 511 U.S. at 841, 114 S.Ct. 1970 (quoting *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).

As noted, appellant contends that the district court erred in instructing the jury that he could be held liable under a deliberate indifference standard. He argues that *Hudson* requires the same subjective culpability standard be applied to persons whose liability is predicated on actions or inactions as supervisors as is applied to prison officials accused of actually using excessive force. We disagree.

Supervisors may be found liable under Section 1983 for their own actions, but also, in certain circumstances, for the actions of their subordinates. A supervisor may be found personally involved in a deprivation of rights in several ways:

[He] may have directly participated in the infraction.... [He], after learning of the violation through a report or appeal, may have failed to remedy the wrong.... [He] may be liable because he [ ] created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue.... Lastly, [he] may be personally liable if he [ ] was grossly negligent in managing subordinates who caused the unlawful condition or event....

*Wright,* 21 F.3d at 501 (citation and internal quotation marks omitted); *see Spencer v. Doe,* 139 F.3d 107, 112 (2d Cir.1998).

The liability of a supervisor under Section 1983 is thus analytically distinct from that of a subordinate who directly caused the unlawful condition or event. *See Madrid v. Gomez,* 889 F.Supp. 1146, 1249 (N.D.Cal.1995) (holding that supervisors may be liable for "conduct of a completely different nature: abdicating their duty to supervise and monitor the use of force and deliberately permitting a pattern of excessive force to develop and persist"). The sadistic and malicious standard articulated in *Hudson* makes little sense, therefore, in the context of supervisory liability under Section 1983 based on, *inter alia,* failing to remedy a known wrong or being "grossly negligent in managing subordinates who caused the unlawful condition or event." *Wright,* 21 F.3d at 501 (citation and internal quotation marks omitted); *see also Al–Jundi,* 926 F.2d at 240 ("There is no basis for applying the heightened *Albers* standard to these allegations."). Given the lack of *respondeat superior* liability under Section 1983, a supervisor's liability is not for the use of excessive force—here, "reprisals"—but for distinct acts or omissions that are a proximate cause of the use of that force.[5]

---

5. To be sure, where a supervisor's liability is predicated on his role in planning the use of force, the appropriate inquiry is that articulated in *Hudson. See Al–Jundi,* 926 F.2d at 238– 39 (granting qualified immunity on claim against Oswald for his role in plan to retake prison (applying *Whitley* standard)). No such claim is made against Pfeil, however.

■ Just as prison officials may be liable for their deliberate indifference to protecting inmates from violence at the hands of fellow inmates, *Farmer,* 511 U.S. at 832–33, 114 S.Ct. 1970, they may also be liable for their deliberate indifference to violence by subordinates, *see Buckner v. Hollins,* 983 F.2d 119, 122 (8th Cir.1993) (applying deliberate indifference standard to claim based on prison official's failure to act); *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) ("[S]upervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act."); *Vaughan v. Ricketts,* 859 F.2d 736, 741 (9th Cir.1988) ("[P]rison administrators' indifference to brutal behavior by guards toward inmates [is] sufficient to state an eighth amendment claim."). Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation. The question of whether an underlying act amounts to an Eighth Amendment violation remains governed, to the extent excessive force is alleged, by *Hudson.* But "reprisals," as defined by the district court, are by definition not in good faith. The district court was therefore correct in instructing the jury that Pfeil might be found liable for acts amounting to "deliberate indifference" to "reprisals" committed in the retaking of Attica.[6]

### b) *Class–Wide Liability*

■ As noted, the jury answered part (A) of the verdict sheet "yes," finding that some acts against one or more prisoners amounting to Eighth Amendment violations under *Hudson*—"reprisals"—had occurred. It also answered part (B) "yes," finding supervisory liability on Pfeil's part for "such reprisals." Appellant contends that the verdict sheet in the liability trial

failed to establish class-wide liability, that is, liability to every member of the class.

This issue is, of course, a major bone of contention, both because of the very considerable confusion over it reflected in the record and because of the centrality of the issue to this appeal. It is not at all clear exactly what issues the district court intended to be established at the liability trial. The jury instructions reflect that confusion. The court told the jury that this was a class action and that the named plaintiffs represent "all of the inmates who were present in D yard of Attica on the morning of September 13, 1971." The court then told the jury that its "decision . . . will apply to any of the members of the class as to whom cruel and unusual punishment has according to your finding been proximately inflicted upon them wantonly by any particular defendant." The last-quoted statement suggests not that the jury was to render a verdict as to liability to every member of the class but that it is to make individual findings as to each inmate with regard to each defendant, as in a trial of individual actions consolidated under Fed.R.Civ.P. 42(a).

Once attention turned to the damages trials, the confusion continued as the court equivocated as to what had actually been established in the liability trial. At one time the court seemed ready to allow Pfeil to contest liability as to every plaintiff in the damages phase, in effect acknowledging that the liability trial settled nothing. It then backtracked and opined that the liability trial had resulted in a verdict that was "prima facie . . . all-encompassing." However, Pfeil was to be allowed "to tender, but not necessarily to adduce, evidence that some particular hurt or deprivation from reprisals was so 'out of-the-mainstream' . . . as to be beyond Pfeil's responsibility." And, at the Brosig damages trail, the court instructed the jury

---

6. We note that the jury was instructed that it could find Pfeil liable if he, *inter alia,* "personally engaged in any such reprisals." While this is, of course, a basis for Eighth

Amendment liability, it is anything but clear that plaintiffs adduced any evidence to support such a theory.

that Pfeil could not be held liable for damages resulting from "some solitary and unrepeated act or omission by some renegade officer."

These second-thoughts by the district court are unsettling to say the least. To reiterate, certification of the class was ostensibly intended to allow a class-wide trial of liability for the "reprisals" by officers after the Attica retaking. In theory, if liability was found, all that remained to be decided in the damages trials was the extent of injuries caused to individuals who had suffered "such reprisals."

The court, however, seems to have realized that, given the actual verdict in the liability trial, the issues remaining for the damages trials were not that simple. The court proposed—but never implemented—an exception to Pfeil's liability in the damages trials, allowing him "to tender but not necessarily to adduce" evidence that some injuries were so "out-of-the-mainstream" as to preclude Pfeil's liability, a proposal so enigmatic on this record as to defy analysis. Worse, the instruction to the Brosig jury not to hold Pfeil liable for "solitary and unrepeated act[s]" by a "renegade officer" cannot be reconciled with the instructions given to the liability-trial jury. It suffices to say here that *Hudson* does not exempt a bad faith act of force— *e.g.,* a murder of a prisoner—because it is "solitary and unrepeated." Moreover, a superior officer can have supervisory liability for being deliberately indifferent to a subordinate's "renegade" murder. Nor should a jury hearing only the damages phase of a case be allowed to ignore injuries caused by acts by "renegade officers" that constitute "reprisals" if the prior jury has held that Pfeil was liable for "such reprisals."

Of course, the court's second-thoughts described above are not directly before us because Brosig got a judgment and has not cross-appealed. However, the court

had good reason to second-guess the effect of the verdict that it seems originally to have believed would be class-wide.

The confusion described above was understandable because the liability jury was given a verdict sheet that could not establish the liability of any defendant to either the class or to any individual plaintiff.[7] In short, the verdict sheet achieved neither the benefits of a class verdict nor those of verdicts in consolidated trials.

The verdict sheet in the liability trial contained two sets of questions with respect to Pfeil's liability for "reprisals." One set addressed his liability for acts that occurred after the retaking but prior to the time the plaintiffs were recalled; the other addressed his liability for the time after the plaintiffs had been relocked in their cells. *See supra* Note 1. Part (A) of each set asked whether the jury found that "officers engaged in reprisals constituting cruel and unusual punishment against the plaintiffs or any of them by using unnecessary or excessive force." Part (B) of each set, to be answered only upon an affirmative answer to (A), instructed the jury to determine whether Pfeil had: (i) "personally engaged in . . . such reprisals"; *or* (ii) "directed or ordered . . . such reprisals"; *or* (iii) "knew [of] such reprisals" and did not do what he reasonably could have done to prevent them; *or* (iv) "was wantonly and deliberately indifferent to . . . such reprisals" and "did not do all that he reasonably could to stop or prevent [them]." Each of these disjunctive clauses was modified by the final clause "so that he should be held liable to the plaintiffs or any of them for any injury or other harm proximately resulting from such reprisals."

This verdict sheet simply does not suffice to establish Pfeil's liability to the entire class or even to particular plaintiffs who suffered injury from a "reprisal." By its express terms, the jury was allowed to

7. Plaintiffs appear to have been content with the verdict sheet. On its face, however, all that could have been established with finality by a verdict was the non-liability of particular defendants to all members of the class.

answer "yes" to part (B) if it found that Pfeil's actions met the requirements of (i) or (ii) or (iii) or (iv) and thereby proximately injured *any* member of the plaintiff class ("plaintiffs or any of them"). Because Pfeil clearly did not participate in each and every reprisal, a finding of liability under (i) would necessarily involve a small fraction of the plaintiffs who suffered "reprisals." Even a finding under (iv) would not be a class-wide finding because the jury was asked only to find wanton and deliberate indifference to "whether there were *any* such reprisals" injuring *any* of the plaintiff class. While there may have been evidence sufficient to find the requisite indifference and lack of preventive action on Pfeil's part with regard to all of the "reprisals," the jury could also have provided the answer "yes" after finding any one of a number of scenarios involving "reprisals" to less than the entire class.

Moreover, part (A) of the verdict sheet did not ask the jury to specify which acts of excessive force toward which prisoners were "reprisals." A "yes" answer to (A) could be based on a finding of one "reprisal" against one prisoner. Even if a "yes" answer to (B) somehow established Pfeil's class-wide liability for "such reprisals," the damages juries would still be left in the dark as to which actions toward which plaintiffs had been found to be "reprisals." Because the verdict sheet did not establish liability to any particular plaintiff, the tasks that the court expected the damages jury to perform are unfathomable.

■ These are no minor matters. Liability under Section 1983 is only for those deprivations of rights caused by the defendant's behavior. In the typical case where a single plaintiff sues over acts arising out of a single incident, there is rarely any question about what the jury found. Not so here. While there is substantial evidence from which a reasonable jury might have concluded that Pfeil's behavior was a proximate cause of all the unconstitutional acts that occurred, the assumption that this is what the liability jury found is

entirely conjectural. Indeed, the verdict sheet invited the jury to find deliberate indifference to one "reprisal" and to end its inquiry without ever considering the hundreds or thousands of other acts of violence. Moreover, the verdict sheet's failure to establish class-wide causation could not have been harmless. The liability jury evidently found the case to be close, because Pfeil was the only one of the defendants to be found liable.

Appellees argue that Pfeil waived any objection to the verdict sheet. The pertinent events were as follows. During the conference at which the verdict sheets were discussed, the district court asked counsel for "any particular objections" to them. Addressing the verdict sheets to be used with respect to Oswald, which, as to supervisory liability, were identical to that to be used with respect to Mancusi and Pfeil, Mitchell J. Banas, Oswald's counsel, objected to several items, including the lack of the word "correctional" before "officers" in (A), the use of the word "reasonably" in (B), and, most significantly, to the phrase "plaintiffs or any of them" in (A) and (B). The latter objection was expressly based on Banas's view "that establishing constitutional deprivation with respect to one Plaintiff, [does not] establish[ ] class-wide liability." Counsel for Mancusi joined in Banas's objections, mentioning specifically the language describing "officers" and the reference to reasonableness. Counsel for Pfeil then stated, "[O]n behalf of Defendant Pfeil, I would simply agree with all of the comments of Mr. Banas as they apply in the same manner to the Defendant Pfeil." However, he added, "In other words, I agree that 'officers' should be changed to 'correction officers', and the same exception taken to the use of the word 'reasonable' in there."

Two questions arise: was Banas's objection to the "plaintiffs or any of them" language sufficient to raise the issue that an answer of "yes" to verdict sheet parts (A) and (B) did not establish class-wide liability and, if so, did Pfeil's counsel adopt

that objection? We answer both questions in the affirmative.

■ As to the first question, the "plaintiffs or any of them" language was certainly part of the larger problem raised by the verdict sheet. The use of "the plaintiffs or any of them" after the words "so that he should be held liable to" in (B) clearly allowed a "yes" answer that could entail a finding of less than class-wide liability without a finding as to which plaintiff or plaintiffs were deemed to have suffered a reprisal. The fact that the verdict sheet was vulnerable to other similar objections does not vitiate the force of the objection actually made. Banas's objection did, therefore, put before the court one of the verdict sheet's various deficiencies with regard to class-wide liability.

■ We also believe that Pfeil preserved his objection to the "plaintiffs or any of them" language. He expressly adopted "all of the comments" of Oswald's counsel because "they apply in the same manner to" Pfeil. The "[i]n other words" sentence that followed mentioned only two of the objections (in essence, repeating what was said by the counsel who spoke right after Banas), but we simply cannot construe those three words to override the express adoption of all of Banas's objections and to constitute a waiver by Pfeil of the basic issue concerning class-wide liability. The purpose of objections to verdict sheets is to alert trial judges to the claims of parties so that appropriate corrections can be made before submission to the jury. That purpose was easily fulfilled in this case.

c) *Bifurcation and the Seventh Amendment*

■ There is an alternative ground for reversal that we discuss in light of the further proceedings necessitated by our disposition of this matter. The bifurcation ordered by the district court allowed the damages juries to reexamine issues decided by the liability jury and thereby violated the Seventh Amendment.

■ Fed.R.Civ.P. 42(b) permits a trial court, "in furtherance of convenience or to avoid prejudice ... [to] order a separate trial of any claim ... or issue," and a decision to utilize this procedure is reviewed deferentially, *see Vichare v. AMBAC Inc.*, 106 F.3d 457, 466 (2d Cir.1996). In addition, Rule 23(c)(4)(A) states that "an action [when appropriate] may be brought or maintained as a class action with respect to particular issues...." In all cases, however, the Seventh Amendment right to trial by jury must be observed. At bottom, issues may be divided and tried separately, but a given issue may not be tried by different, successive juries. *See Byrd v. Blue Ridge Rural Elec. Coop.*, 356 U.S. 525, 537–38, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931) ("Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice."); *In re Rhone–Poulenc Rorer Inc.*, 51 F.3d 1293, 1303–04 (7th Cir.1995) (granting mandamus directing district judge to decertify class action).

It can hardly be disputed that in the instant matter both the liability jury and the damages juries were asked to determine whether the same acts constituted "reprisals." That was the issue to be resolved in part (A) of the verdict sheet in the liability trial. However, (A) did not ask the jury to specify which acts were found to be "reprisals" and which were not. The damages juries were not, therefore, given a list of acts constituting "reprisals" and asked to award damages to particular plaintiffs injured by them. Instead, the jurors in the damages trials were told that there had been "reprisals" but were asked to determine for themselves which particular acts constituted such "reprisals." They were instructed:

Accepting, as you must, that there were acts of reprisals you must determine whether this plaintiff ... suffered and/or suffers and/or will suffer the effects of such.... Also you must extend to these Officers a degree of leniency and tolerance *in judging whether any particular act was a reprisal.* It might or might not have been completely justified under the then circumstances to make all inmates take off all of their clothes or to lie on the ground or to be funneled through lines of Officers so to go to their cells, but more than what was needed and justified in any or all of that was done by some Officers to some inmates and each of such inmates thereby suffered from a reprisal and is entitled to recover therefore from Mr. Pfeil....

The damages juries were therefore left free to determine whether any particular act constituted a "reprisal"—the Brosig damages jury was even asked to revisit Pfeil's supervisory liability for "solitary and unrepeated" acts of "renegade officers"—without regard to how the liability jury viewed that particular act. This of course created the real possibility—amounting to a probability—that acts found to be "reprisals" by the liability jury were different from the acts found to be "reprisals" by the damages juries. This procedure clearly violated the Seventh Amendment.

### d) *Class Certification*

Although our disposition of this matter lessens the importance to this appeal of appellant's claim that certification of this case as a class action pursuant to Fed. R.Civ.P. 23(b)(3) was error, we nevertheless address it in light of the fact that retrials seem inevitable.

▮▮▮ A district court's decision to certify a class is reviewed for abuse of discretion, and "[a] reviewing court must exercise even greater deference when the

district court has certified a class than when it has declined to do so. However, the failure to follow the proper legal standards in certifying a class ... is an abuse of discretion." *Marisol A. v. Giuliani,* 126 F.3d 372, 375 (2d Cir.1997) (per curiam) (citation omitted).

To qualify for certification, a putative class action must meet the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. In addition, a class certified under Rule 23(b)(3) must meet that provision's heightened requirements that "[common] questions of law or fact ... predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3) further notes that:

> The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

With the benefit of hindsight, it is difficult for us to see how, with regard to this particular class, common issues of law and fact predominate over individual ones ("the predominance issue") or that a class trial was superior to individual trials ("the manageability issue").

This is an unusual class-action mass-tort case in that it has actually been tried to verdicts.[8] Usually, of course, a class action in a case like this does not go to trial. Rather it is settled, and the court that

---

8. *Meriwether v. Coughlin,* 879 F.2d 1037 (2d Cir.1989), was brought as a class action but involved a single trial on liability and damages, and individual verdicts, resembling consolidated rather than class proceedings.

certifies the class fully expects that settlement. *See, e.g., In re "Agent Orange" Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 166 (2d Cir.1987) (settlement "almost as inevitable as the sunrise"). Indeed, it is often the ease of bringing about a settlement on a class basis that is the catalyst for certification. *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2239, 138 L.Ed.2d 689 (1997) (filing of complaint, answer, proposed settlement agreement, and joint motion for conditional class certification on same day). This process has of course been subject to criticism regarding the fairness of the settlement to the class, *see Agent Orange*, 818 F.2d at 165–66, the adequacy of representation, *see id.* at 165, and Article III concerns, *see Amchem*, 117 S.Ct. at 2244.

Indeed, the Supreme Court recently addressed some of these issues in *Amchem*, in which the Court upheld the reversal of a district court's certification of a settlement-only class in the asbestos context. The narrow issue in *Amchem* was whether settlement-only classes must comport with the requirements of Rule 23. The Court held that they must, except that a court "need not inquire whether the case, if tried, would present intractable management problems." *Id.* at 2248. Although *Amchem* involved a "settlement-only" class, the Court made clear that its skepticism regarding certain types of class actions was based on concerns going beyond the narrow context of settlement class actions. In particular, the Court's analysis sharply curtailed the ability to certify a class action pursuant to Rule 23(b)(3) in the mass tort context.

The proposed class in *Amchem* encompassed all persons who had been exposed, or who had a family or household member who had been exposed, to asbestos attributable to one of a consortium of twenty companies but who had not yet filed an asbestos-related lawsuit against the consortium. *See id.* at 2239–40. With the class so defined, the case involved numerous theories of liability and defenses, varying kinds of exposure to different individuals over different periods of time, different injuries, and different governing laws. *See id.* at 2250. The Court, describing this class as the most "sprawling" it had seen, had no trouble concluding that it failed Rule 23(b)(3)'s predominance requirement. *Id.* It explained that "[t]he [ ] predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 2249. In light of the numerous potential conflicts among the interests of different types of plaintiffs, the proposed class was simply not cohesive under any standard. *See id.* at 2250.

The class in the instant matter is far less sprawling than the one in *Amchem* and involves only federal law. Moreover, there appears to be no concern with the preclusive effect of a judgment on absent plaintiffs. For these reasons, this case is quite different from the "adventuresome" uses of the class action device that the Court and commentators have criticized. *See id.* at 2244 (criticizing certain uses of Rule 23 as "nonadversarial endeavor[s] to impose on countless individuals without currently ripe claims an administrative compensation regime binding on those individuals if and when they manifest injuries").[9] Nevertheless, viewing the matter

9. This is not a settlement-only class, the case has been vigorously contested, and it does not involve "inventory" plaintiffs. *See Amchem*, 117 S.Ct. at 2247–48. Further, no plaintiffs are objecting, and there has not been a reverse-auction or other coercive settlement. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 388–89, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (Ginsburg, J., concurring in part and dissenting in part); *cf. Rhone–Poulenc Rorer*, 51 F.3d 1293 (7th Cir.1995) (granting manda-

mus ordering decertification where class certification would effectively force defendant to settle to avoid a small chance of catastrophic liability). In addition, there are here no "migratory settlers" who have come from or fled to another jurisdiction, *see In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 134 F.3d 133 (3d Cir.1998); *Romstadt v. Apple Computer, Inc.*, 948 F.Supp. 701 (N.D.Ohio 1996), pursuit of this action does not threaten another court's jurisdiction, *see*

in hindsight, it is difficult to see how certification of this particular class produced any benefits once settlement attempts failed. With regard to the predominance issue, our discussion of the verdict sheet itself suggests that the district court's perception of common issues was a vast oversimplification. We cannot claim to have the same familiarity with the record as the district court, but, even at a glance, the case bristles with individual issues. For example, the determination of what acts constituted "reprisals" involves consideration of a variety of conduct, including forcing the inmates to strip and lie on the ground, making them run through gauntlets, beatings during the gauntlets, singling out and beating the leaders, and more random acts of violence against individual prisoners. As to each, a trier must determine what happened and—here the easier questions—its constitutional significance.

The case does not end there, however. Because Section 1983 liability requires personal involvement, the supervisory liability of several defendants must be determined, another issue with varying components as to each defendant. For example, Pfeil's liability might depend on findings that differed with regard to different members of the class. A trier might distinguish between his liability for injuries suffered by a class member who was beaten in Pfeil's presence and a class member who was beaten elsewhere. Similar distinctions might conceivably be drawn by a trier with regard to acts of violence when Pfeil was present at Attica and when he was home.

Moreover, in order to permit subsequent individualized damages determinations, a special verdict would have to be returned specifying the set of acts determined to be "reprisals" and for which subset of those

acts each defendant was liable. Absent such findings, the damages juries would have to reexamine with regard to each individual plaintiff which acts were "reprisals" and, perhaps, as the Brosig jury was asked, to revisit the issue of supervisory liability. This in turn would violate the Seventh Amendment.

Which brings us to the management issue. As presented in the record before us, the benefits anticipated by the district court from a liability trial involving this particular class were illusory. As the cases were actually tried, the liability jury determined a "reprisal(s)" occurred and that Pfeil was liable for "such reprisal(s)." The damages juries were then asked to determine what award to make for particular injuries to particular plaintiffs without a clue as to whether those injuries were caused by acts that the liability jury deemed to be the "reprisals" for which Pfeil was liable. Indeed, the damages juries were told that there had been "reprisals," but it was up to them to determine what acts were or were not "reprisals."

To be sure, a proper liability trial involving this particular class could have been conducted, as described above. One may question, however, whether the complexity of such a trial and the special verdict it would entail might not have outweighed any benefits. Most of the benefits of class certification seem to have been in the pretrial proceedings, but those advantages could have been fully realized through the use of other consolidation techniques, such as consolidating all discovery relating to Pfeil's liability without certifying a class. *See In re Repetitive Stress Injury Litig.*, 11 F.3d 368, 374 (2d Cir.1993). It may also have been the case, and may still be, that the claims of some plaintiffs have so many common factual elements that a consolidated trial of those claims followed by

*In re Federal Skywalk Cases*, 680 F.2d 1175 (8th Cir.1982), and pursuit of another action does not threaten this court's jurisdiction, *see Carlough v. Amchem Prods., Inc.*, 10 F.3d 189 (3d Cir.1993). Finally, this case does not involve a constructive bankruptcy. *See In re Joint E. and S. Dist. Asbestos Litig.*, 14 F.3d

726, 732 (2d Cir.1993). *See generally* John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L.Rev. 1343 (1995); Henry Paul Monaghan, Antisuit Injunctions and Preclusion Against Absent Nonresident Class Members, 98 Colum. L.Rev. 1148 (1998).

verdicts involving each defendant and each plaintiff would be efficient case management.

Although we doubt the wisdom of certifying this particular class, we do not decide whether the class was improperly certified because it is not essential to our disposition of the case. We leave further proceedings to the sound discretion of the district court.

## CONCLUSION

For reasons stated, we reverse and remand. Given the long history of this matter, we direct the district court to give it expedited treatment. We stand ready to exercise our mandamus power should unreasonable delay occur. We respectfully suggest that the Chief Judge of the district court consider assigning this matter to the judge best able to expedite its resolution.

We note that the defendants in this case, who are functionally the State of New York, have done all they could—frequently not without the court's acquiescence—to delay resolution. That strategy can no longer be tolerated. The district court should not hesitate to resort to appropriate sanctions to induce the defendants to cooperate in promptly resolving this matter.