Jessie J. BARNES, 09–B–2707, Plaintiff,

v.

John ALVES, et al.,[1] Defendants.

No. 01–CV–6559 EAW.

United States District Court,
W.D. New York.

Signed Nov. 10, 2014.

---

1. Defendant John Alves was dismissed from the case on December 3, 2007; however, his name is retained as the lead defendant for ease of identifying this lawsuit.

Jessie J. Barnes, Malone, NY, pro se.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

## I. PROCEDURAL BACKGROUND

Plaintiff Jessie J. Barnes ("Plaintiff"), proceeding *pro se*, commenced this action on November 26, 2001, alleging various causes of action against numerous defendants arising from alleged assaults, the conduct of Tier III disciplinary hearings, failure to provide adequate medical care, and conditions of confinement. (Dkt. 1). At the time of the alleged incidents, Plaintiff was an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and was housed at the Southport Correctional Facility. (*Id.* at ¶ 5). During the relevant time period, Peter Mastrantonio, Jr. ("Mastrantonio, Jr."), Angelo Mastrantonio ("A. Mastrantonio"), Gregory Hungerford, James Marshall, Ronald Potter, Randy Banks, Paul Weed, Courtney Bennett, Thomas Berg, Daniel Davis, Mark Vandegrift, Carey Bubacz, Donald McIntosh, Thomas Dininny, Timothy Murley, Franklin Raub, and Harold Wetzel (collectively "Defendants") were employees of DOCCS, assigned to the Southport Correctional Facility. (Dkt. 1 at ¶ 6). Plaintiff seeks monetary damages pursuant to 42 U.S.C. § 1983 for alleged violations of his constitutional rights under the First, Eighth, and Fourteenth Amendments. (*Id.*).

On April 22, 2002, Plaintiff filed a motion to amend his complaint, stating new causes of action in addition to his prior claims. (Dkt. 10). The Court granted the motion to amend, with some limitations. (Dkt. 15).

On October 21, 2002, Plaintiff filed a motion for leave to file a supplemental complaint, including new causes of action. (Dkt. 18). The Court granted the motion in a March 14, 2003 order that also dismissed some of Plaintiff's causes of action. (Dkt. 27).

On December 17, 2003, Plaintiff filed a complaint with this Court that was filed under Case No. 03–CV–6637 CJS, alleging assault by Defendant Peter Mastrantonio, Jr. on October 22, 2002. (Dkt. 1 at ¶ 16).

On August 3, 2006, this Court assigned Plaintiff counsel for the purpose of "mak[ing] an assessment of the relative strengths and merits of the claims, and recommend[ing] strategies for strengthening Mr. Barnes's action by eliminating the claims that are unlikely to be fruitful." (Dkt. 209). Through his appointed counsel, Plaintiff issued a second amended complaint on December 10, 2007. (Dkt. 248). This new complaint consolidated case number 03–CV–6637 into the present case, under case number 01–CV–6559, and narrowed Plaintiff's claims before the Court. (*Id.* at ¶ 18).

Plaintiff's claims have been narrowed to four instances of alleged excessive use of force against 17 named Defendants and a retaliation claim against a single Defendant.

Plaintiff formally waived his right to a jury trial and the case was tried before the Court over the course of five days, commencing July 28, 2014. Plaintiff appeared *pro se* after numerous applications for appointment of counsel were denied due to documented threats by Plaintiff toward prior appointed counsel.

At trial, Plaintiff testified, as did 16 of the 17 named Defendant officers and five additional witnesses. The Court received numerous exhibits, including photographs, reports relating to the incidents, and pertinent portions of Plaintiff's medical records. Additionally, the Court viewed videotape evidence relating to the April 18, 2002,

September 4, 2002, and October 22, 2002 incidents.[2]

After considering all of the evidence, the Court finds that Plaintiff has failed to carry his burden, by a preponderance of the evidence, that Defendants separately or together violated his constitutional rights by using excessive force. It is evident that some force was used on Plaintiff, but the Court finds that Plaintiff has failed to meet his burden to show by a preponderance of the evidence that the officers acted maliciously or sadistically for the purpose of causing Plaintiff harm or injury in exercising the use of force. Similarly, Plaintiff has failed to meet his burden to establish that Defendant Mastrantonio, Jr. engaged in retaliatory conduct in violation of Plaintiff's constitutional rights. This Decision and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## II. MOTION IN LIMINE

Plaintiff's April 30, 2010 motion *in limine* seeks the preclusion of evidence or testimony by Defendants concerning the September 4, 2002, October 22, 2002, and April 18, 2002 incidents. (Dkt. 327). Plaintiff claimed that the videotape evidence for the September 4, 2002 and October 22, 2002 incidents was improperly destroyed. Plaintiff also contended that the April 18, 2002 videotape was altered.. (*Id.*).

In his March 28, 2014 motion for sanctions, Plaintiff reasserted that the September 4, 2002 and October 22, 2002 tapes were improperly destroyed, and that the April 18, 2002 tape was altered. (Dkt. 395). In connection with these allegations, Plaintiff requested that the Court "draw

an adverse inference" against Defendants due to the alleged spoliation of evidence.

■ "The Second Circuit defines spoliation as 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Taylor v. City of New York*, 293 F.R.D. 601, 609 (S.D.N.Y.2013) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999)). "A party seeking sanctions for spoliation of evidence must establish the following three elements: '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim ... such that a reasonable trier of fact could find that it would support that claim.'" *Id.* (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir.2002)).

### A. September 4, 2002 Video

■ Plaintiff has failed to demonstrate that a videotape of the September 4, 2002 incident ever existed. Defendants testified, and Plaintiff acknowledged, that there are no recordings of the gallery in B–Block, where the incident took place. To the extent that Plaintiff requested tapes of the area outside of the gallery, to capture images of officers entering and leaving the gallery, Plaintiff has not sufficiently demonstrated that these tapes would be relevant to his case, or that Defendants had control over the destruction of the tapes. On September 17, 2002, Plaintiff filed a grievance requesting that video from the September 4, 2002 incident be preserved.

---

**2.** Plaintiff objected to portions of the videotapes as irrelevant. In addition, the videotapes were subject to Plaintiff's motion for a finding of spoliation and request for sanctions

in the form of preclusion of the tapes. The Court reserved decision on these issues, and they are addressed in further detail in this Decision and Order.

(Ex. 15). However, Plaintiff has not presented any evidence that the video existed and was destroyed with a culpable state of mind. Plaintiff's motion as to the September 4, 2002 videotape is denied.

### B. October 22, 2002 Video

As with the September 4, 2002 incident, the October 22, 2002 altercation took place in B–Block, where no recordings were made. On November 1, 2002, Plaintiff wrote a FOIL request to preserve the video from the October 22, 2002 incident. (Ex. 30). On December 4, 2002, Mr. Anthony Annucci, Deputy Commissioner and Counsel for DOCCS, informed Plaintiff by letter that no video existed for October 22, 2002, and that therefore there was nothing to produce. (Ex. 31). Defendants did produce the video taken in conjunction with the use of force report for this incident. (Ex. 6b). In sum, Plaintiff has not established that Defendants destroyed any tape from October 22, 2002, with a culpable state of mind. Plaintiff's motion as to the October 22, 2002 video is denied.

### C. April 18, 2002 Video

Plaintiff claimed that the April 18, 2002 video (Ex. 6a) is a staged reproduction manufactured to conceal the fact that Defendant Potter repeatedly slammed the tray slot door on Plaintiff's forearm. Defendants maintained that the video is a true and accurate depiction of the events as they occurred on April 18, 2002.

The video in question is admittedly of poor quality. The video clearly depicts three correction officers standing with a cart in front of a cell on D–Block. At trial, Plaintiff had Defendants Dininny, Bubacz, and Potter stand for identification. Plaintiff argued that it was clear that these Defendants were not portrayed in the videotape. Specifically, Plaintiff suggested that Defendant Dininny was too thin to be one of the individuals in the videotape. In response, each of these Defendants testified that they were depicted in the video, and that the videotape was a true and accurate representation of what occurred on that day in D–Block.

Based on the Court's own viewing of the tape, and on the testimony provided by Plaintiff and Defendants, the Court admits the April 18, 2002 videotape (Ex. 6b) into evidence as an accurate portrayal of the incident. Plaintiff's motion with respect to this video is denied.

However, included on another videotape in evidence (Ex. 6) is a color portion of the video related to an April 18, 2002 cell extraction that Defendants allege led up to the April 18, 2002 incident. In this segment of the tape, Defendant Potter participated in the extraction of Plaintiff from his cell after Plaintiff refused to come out for a cell search. At trial, Plaintiff objected to the admission of this segment of the tape, arguing that it was irrelevant to his underlying claims and that the cell extraction was separate and apart from his later relevant interaction with Defendant Potter. The Court reserved decision on Plaintiff's objection.

Plaintiff argued that the reason for his reaching out of the hatch and into the cart is that he needed supplies as a result of being extracted from his cell earlier in the day. Accordingly, it is relevant that the cell extraction occurred. However, the details of the cell extraction itself are not particularly relevant. As a result, the Court sustains Plaintiff's objection and will exclude from consideration the video reflected on Exhibit 6 of the cell extraction that took place earlier in the day, prior to the April 18, 2002 incident.

### III. CREDIBILITY

At trial, the Court heard testimony from Plaintiff, sixteen Defendants, and five additional witnesses.

Resolution of the legal issues in this matter cannot be achieved without first determining the credibility of the parties. Once that determination is made, resolution of the legal claims follows rather easily. It is the credibility finding that is the more challenging inquiry. Having heard and considered the testimony of Plaintiff and Defendants, and having evaluated their demeanor, the Court cannot say that one party's version of the events is credible and the other party's is not. Otherwise, the resolution of this case would be far more straightforward. Instead, the Court is confronted with testimony offered by each party which, in material respects, is unconvincing.

In evaluating Plaintiff's credibility, the Court finds that Plaintiff's testimony is less than fully credible. Aside from Plaintiff's history as a convicted felon,[3] Plaintiff appeared to have intentionally misrepresented facts at trial.

For example, although Plaintiff testified that he never had trouble with correction officers at Southport prior to the April 30, 2001 incident, his inmate disciplinary history that Plaintiff himself admitted into evidence (Ex. 7), states otherwise. For example, on September 24, 2000, Plaintiff had a "lewd conduct" charge, on September 29, 2000, Plaintiff was found guilty of interference and harassment, on December 20, 2000, Plaintiff was found guilty of threats to staff, and on March 31, 2001, Plaintiff was found guilty of demonstration, interference, and harassment. (Ex. 7).

In addition, Plaintiff testified that he had not injured his right ankle before the September 4, 2002 incident. However, the medical records show that Plaintiff had a preexisting bone formation from a prior ankle injury. At trial, Plaintiff was forced to contradict his prior sworn testimony, and he admitted that he had previously broken his right ankle in 1996. These intentional misrepresentations damage Plaintiff's credibility.

The Court also finds that Plaintiff's witnesses were less than fully credible. Mr. Jayson Thompson, an inmate housed in the same cell-block as Plaintiff at the time of the April 30, 2001 incident, was a less than credible witness. Plaintiff attempted to portray Mr. Thompson as a "model inmate," and elicited testimony from Mr. Thompson that he had not spent any time in SHU from 2001–2012. However, on cross examination, Mr. Thompson was confronted with his disciplinary report and acknowledged that he had been placed in SHU several times during those years, thus contradicting his earlier testimony that he had not spent any time in SHU from 2001–2012.

Mr. Francisco Ramos, also housed in the same cell-block as Plaintiff on April 30, 2001, openly admitted that he recalled little, if any, of the alleged incident. He testified that he had spoken with another inmate-witness about the fact that he was testifying for Plaintiff during the transport to the courthouse for trial.

That other inmate-witness was Mr. Jonathan Wynn, a/k/a Piru Umoja, who allegedly witnessed the September 4, 2002 and October 22, 2002 incidents. Plaintiff himself acknowledged during Mr. Wynn's testimony that Mr. Wynn was confused and combining two separate incidents into one. In addition, Mr. Wynn testified that he did not speak to any other inmate-witness

---

**3.** Although Plaintiff's criminal history is more extensive, pursuant to Fed.R.Evid. 609, and for the reasons stated on the record at the commencement of this trial, the Court considers only Plaintiff's 1997 conviction for burglary in the second degree as relevant to the instant matter.

about the fact that he was testifying for Plaintiff on that date, directly contradicting the testimony of Mr. Ramos about the communication.

Plaintiff also called Dr. John Alves to testify as to Plaintiff's physical injuries following the alleged incidents. As a former Defendant in the instant matter, Dr. Alves was a hostile witness. Notably, Dr. Alves adamantly testified that Plaintiff was not sent to an outside hospital for an x-ray on September 5, 2002, because his notes did not state that he was sent to a hospital. However, medical records from Arnot Ogden Medical Center showed that Plaintiff did have an x-ray performed at the outpatient facility on September 5, 2002. This indicates that Dr. Alves did not have an independent recollection of the events and was wholly relying on his medical records to deliver his testimony. In sum, Plaintiff's witnesses as a whole were less than credible.

However, Defendants presented similar credibility challenges. Few, if any, of Defendants were able to independently recollect the events, instead appearing to recite the information contained in their statements and reports drafted after the events.

For example, Defendant Dininny seemed to have little independent recollection of the events of April 18, 2002, and throughout his testimony referred to what he had seen happen on the videotape of the incident recently viewed in open court. Defendant Bubacz also had little independent recollection of the events of April 18, 2002, and many times in his testimony referred to what he saw happen in the videotape, or what he "would have" done. Defendant Berg appeared to have little independent recollection of the incident on September 4, 2002. For instance, on cross examination, Defendant Berg explained that he knew Plaintiff had turned to strike Defendant Mastrantonio, Jr. because he read it in his memorandum from that day.

In addition, the behavior of some of the individual Defendants in the courtroom contributes to the Court's skepticism concerning their credibility. Defendant Bennett's behavior was particularly troubling. During his testimony, Defendant Bennett made faces at Plaintiff and answered Plaintiff's questions in a mocking tone. Defendant Bennett similarly displayed impertinence when responding to the Court's questions. At a minimum, this behavior lacked the decorum appropriate for a proceeding in Federal Court. By contrast, notwithstanding the warnings contained in Defendants' pretrial materials concerning Plaintiff's anticipated behavior in the courtroom (Dkt. 418 at 10–11), Plaintiff maintained a professional and respectful demeanor throughout the trial, even when faced with what appeared to be intentional efforts by some of Defendants to provoke a response from Plaintiff.

However, in evaluating the credibility of the parties, the Court is mindful that the ultimate burden of proof rests with Plaintiff. It was thus incumbent upon Plaintiff to establish his cause of action by a preponderance of the evidence. This Plaintiff failed to do.

## IV. DISCUSSION—FINDINGS OF FACT AND LAW

### A. LEGAL STANDARD

 "In a civil case, the plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence." *Brown v. Lindsay*, Nos. 08–CV–351, 08–CV–2182, 2010 WL 1049571, at *12 (E.D.N.Y. Mar. 19, 2010). "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." *Id.* (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d

Cir.1997)). "Under the preponderance of the evidence standard, if the evidence is evenly balanced, the party with the burden of proof loses." *Richardson v. Merritt,* No. 12–CV–5753 (ARR), 2014 WL 2566904, at *5 (E.D.N.Y. June 4, 2014) (citing *Kosakow v. New Rochelle Radiology Assocs.,* 274 F.3d 706, 731 (2d Cir.2001)). In other words, if the credible evidence on a given issue is evenly divided between the parties—that it is equally probable that one side is right as it is that the other side is right—then the plaintiff has failed to meet his burden.

As discussed further below, the evidence with respect to many of Plaintiff's claims is evenly balanced. In other words, the Court cannot determine that one party's version of the events is more likely true than the other party's version of the events.

However, because Plaintiff bears the burden of demonstrating by a preponderance of the evidence that Defendants used excessive force or retaliated against him in violation of his constitutional rights, the Court must find for Defendants in this matter.

## B. EXCESSIVE USE OF FORCE

Plaintiff claims that Defendants, by using excessive and unnecessary force against him, violated his Eighth Amendment constitutional rights.

■ "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009). In order to prove a violation under the Eighth Amendment, Plaintiff must prove each of the following two elements by a preponderance of the evidence: (1) Defendants used force against Plaintiff maliciously and sadistically, for the very purpose of causing Plaintiff harm; and (2) Plaintiff suffered some harm as a result of Defendants' use of force.

■ The first element is considered as a subjective analysis of Defendants' state of mind at the time of the incidents. This requires a showing that Defendants had " 'the necessary level of culpability, shown by actions characterized by wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright,* 554 F.3d at 268 (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). Whether a use of force against a prison inmate is unnecessary or wanton depends on "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* (quoting *Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).

■ Some factors to consider in determining whether the prison officials unnecessarily and wantonly inflicted pain on Plaintiff include: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (citing *Whitley v. Albers,* 475 U.S. 312, 321, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)).

If an evaluation of these factors leads the [trier of fact] to conclude that the defendants acted maliciously, wantonness has been established. And an Eighth Amendment violation has occurred. If, on the other hand, reflection upon these factors leads the [trier of fact] to find that the defendants acted in a good-faith effort to maintain and re-

store discipline, no constitutional violation has occurred because the subjective component of the claim has not been satisfied.

*Id.* (alterations in original).

■ "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8, 112 S.Ct. 995). Although any physical injury and the extent of such an injury should be considered, a use of force can violate the Eighth Amendment even if it does not cause a significant injury. While the extent of any injuries may aid the Court in assessing whether a use of force was legitimate, a malicious and sadistic use of force violates the Eighth Amendment even if it produces no significant physical injury. *See Wright*, 554 F.3d at 268–69 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). "Nonetheless, the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to 'de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.'" *Id.* at 269 (quoting *Hudson*, 503 U.S. at 8, 112 S.Ct. 995). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Id.* (quoting *Hudson*, 503 U.S. at 9, 112 S.Ct. 995).

### 1. April 30, 2001

It is undisputed that on April 30, 2001, Plaintiff was involved in an incident with Defendants A. Mastrantonio, Hungerford, Potter, and Marshall. Plaintiff was going to the shower when he violated a facility rule by passing contraband (a bar of soap) to another inmate. Plaintiff was directed to return to his cell. Defendant A. Mastrantonio placed his hands on Plaintiff and instructed Plaintiff to move forward. Plaintiff turned toward Defendant A. Mastrantonio. Then, whether Plaintiff fell or was pushed, Plaintiff went to the ground, where there was a struggle, after which Plaintiff was carried in some manner back to his cell by Defendants Potter, A. Mastrantonio, and Marshall. Defendant Davis assisted in escorting Plaintiff to his use of force examination. The more specific details of the incident are in dispute.

#### a. Plaintiff's Proof

Plaintiff testified that Defendant A. Mastrantonio saw his attempt to pass soap to another inmate and ordered Plaintiff to go back to his cell. Plaintiff testified that Defendant A. Mastrantonio then "pushed" Plaintiff in the back multiple times, to the point that Plaintiff claims he almost fell to the ground. Plaintiff testified that he was protesting the contact because he was returning to his cell. Defendant A. Mastrantonio was ordering Plaintiff to "move faster" as he pushed on Plaintiff's back. Plaintiff turned toward Defendant A. Mastrantonio. At that time, Plaintiff testified, Defendants A. Mastrantonio, Marshall, Hungerford, and Potter took Plaintiff to the floor and started "beating" him. Plaintiff's head hit the floor, and Plaintiff testified that he became "woozy." Plaintiff stated that one of the officers put Plaintiff in a figure four hold position and Defendant Potter placed leg irons on Plaintiff.

Plaintiff testified that Defendants then started to carry him back to his cell, but at some point, dropped him and were "dragging" him down the gallery to his cell. Plaintiff indicated that his feet were in the air, and at least one of his shoulders was on the ground, causing a scrape on his shoulder. When Plaintiff returned to his cell, he was instructed to get on his hands

and knees. Plaintiff testified that Defendants A. Mastrantonio, Marshall, and Potter "rammed" his face into the gate and took the leg irons off before placing Plaintiff in his cell.

Plaintiff refused to put his hands through the feed up slot to be uncuffed until he was provided with medical treatment. Nurse Terry Whedon allegedly treated Plaintiff for a sore ankle and ringing in his ears.

Plaintiff filed a grievance concerning this incident on May 8, 2001. (Ex. 1). Plaintiff also filed a May 4, 2001, complaint to the superintendent of Southport Correctional Facility. (Ex. 2). On May 17, 2001, Plaintiff filed an additional complaint regarding the April 30, 2001 incident. (Ex. 3).

In support of his arguments, Plaintiff presented the testimony of inmate-witnesses Jayson Thompson and Francisco Ramos, alleged eyewitnesses to the incident.

Jayson Thompson, an inmate housed in the same cell-block as Plaintiff at the time of the April 30, 2001 incident, testified that he was sitting on his bed when he "overheard a commotion that was taking place in the front of the company where the showers are located." Mr. Thompson stated that he heard Plaintiff saying "you didn't have to put your hands on me," and complaining that he was having difficulty breathing. Mr. Thompson testified that he heard leg shackles applied and saw Plaintiff "half carried half dragged" back to his cell, whereupon he was "kicked" into his cell by an officer. Mr. Thompson reviewed the affidavit that he had prepared for Plaintiff's Tier III hearing in preparation for his testimony at trial.

Francisco Ramos, an inmate housed in the same cell-block as Plaintiff at the time of the April 30, 2001 incident, testified that he saw Plaintiff in an altercation with two or three officers. Mr. Ramos testified that he saw Plaintiff hit the floor backwards, and that Plaintiff had soap and a washrag behind him that fell to the floor as well. Mr. Ramos testified that he heard, but did not see, an altercation with the officers, and then he saw Plaintiff being dragged past his cell by the officers to be placed in Plaintiff's cell. Mr. Ramos testified that Plaintiff's legs were dragged along the floor.

### b. Defendants' Proof

Defendants contended that Plaintiff lunged toward Defendant A. Mastrantonio, slipped and fell to the floor, and then struggled and kicked Defendants while they carried Plaintiff back to his cell. Defendants denied "ramming" Plaintiff's head into his cell when removing the leg restraints.

Defendant A. Mastrantonio testified that, after seeing Plaintiff drop a bar of soap, he gave Plaintiff a direct order to return to his cell, and that Plaintiff turned around, but started arguing and getting "verbally abusive." Plaintiff stopped walking, and Defendant A. Mastrantonio admitted that was when he placed his hand on Plaintiff's back to motion Plaintiff to keep moving. At this point, Defendant A. Mastrantonio claimed that Plaintiff "turned" on him and tried to lunge at him. When Defendant A. Mastrantonio stepped back, Plaintiff fell down, and started fighting. Defendant A. Mastrantonio testified that he, Defendant Hungerford, and another officer were attempting to hold Plaintiff on the ground while Plaintiff was flailing his feet and his arms trying to get up. Defendant A. Mastrantonio testified that Plaintiff only had handcuffs on at this point. At that time, Defendant A. Mastrantonio testified that leg restraints were placed on Plaintiff and he was picked up and carried back to his cell. Plaintiff's leg restraints

were removed and Plaintiff was placed in his cell, but Plaintiff refused to put his hands up through the hatch to have his handcuffs removed.

Defendant Hungerford testified that he was the officer controlling the shower equipment at the time of the incident on April 30, 2001. He testified that Defendant Marshall let Plaintiff out of his cell and Plaintiff proceeded up the company toward the showers when he dropped a bar of soap and kicked it under a cell. Defendant Hungerford stated that Defendant A. Mastrantonio gave Plaintiff a direct order to return to his cell, that Plaintiff began to return to his cell, but then started to get "verbally abusive." Defendant Hungerford testified that he then observed Plaintiff stop, and turn around to face Defendant A. Mastrantonio, at which point Defendant A. Mastrantonio used a body hold to take Plaintiff to the ground. Defendant Hungerford testified that he then went to assist Defendant A. Mastrantonio, and he held Plaintiff's legs in a "bear hug type motion" to stop Plaintiff from thrashing until more assistance came. Defendant Hungerford testified that Plaintiff was wearing leg restraints at this time. Defendant Potter then came and took control of Plaintiff's legs so that Defendant Hungerford could return to the other inmates, and Plaintiff was carried back to his cell.

Defendant Marshall testified that he was the officer applying restraints and motioning for the console officer to open the cell doors to allow inmates to walk to the showers on April 30, 2001. He observed an altercation with Defendant A. Mastrantonio and Plaintiff when he saw the two facing each other, and Plaintiff lunged toward Defendant A. Mastrantonio. Defendant Marshall testified that Plaintiff went to the ground and Defendant A. Mastrantonio ended up on top of Plaintiff, while Plaintiff was "violently" struggling. Defendant Marshall testified that he assisted in carrying Plaintiff to his cell, and that was the only force he used on Plaintiff.

Defendant Potter testified that he was the C–Block officer on April 30, 2001. After seeing Defendant Hungerford run down the gallery, Defendant Potter went to the gallery, where he saw Defendants A. Mastrantonio, Marshall, and Hungerford on top of Plaintiff. Defendant Potter testified that he then went to get a pair of leg irons because he did not see a pair on Plaintiff, but when he returned, Plaintiff had a pair of leg restraints on. Defendant Potter then carried Plaintiff's legs and Defendant A. Mastrantonio carried Plaintiff's arms, and Plaintiff was returned to his cell. Defendant Potter stated that he observed force being used, but that it was not excessive force.

Defendant Davis testified that he and another officer escorted Plaintiff from the shower to be seen by medical staff for use of force photographs following the incident, and that he was in no way involved in the actual use of force.

#### c. Analysis

Plaintiff has failed to demonstrate by a preponderance of the evidence that the force used on April 30, 2001 was excessive, or done maliciously to cause harm, as opposed to being a justified response to control an inmate's behavior. Plaintiff admitted that passing soap to another inmate was a violation of the rules, and he admitted that he turned toward Defendant A. Mastrantonio to protest the physical contact of touching Plaintiff's back. Correction officers have a legitimate safety concern when an inmate turns to face an officer, because the intentions of the inmate are unknown. Further, although Plaintiff was returning to his cell as directed, he violated a direct order when he stopped and turned to face Defendant A.

Mastrantonio. In this respect, some use of force was justified in response to Plaintiff's actions on April 30, 2001.

Further, the injuries sustained by Plaintiff following this incident were minimal. The use of force photos from the incident show only a few light red marks on Plaintiff's left shoulder. (Ex. 401–07). The use of force medical report indicates that Nurse Whedon examined Plaintiff at 11:05 a.m. after a use of force at 10:23 a.m., and that although Plaintiff complained that his left ankle was broken, there were "no red areas or swelling noted." (Ex. 408). Nurse Whedon identified abrasions on Plaintiff's left shoulder, left knee, right shin, left forearm, and at the wrists and ankles, but no active bleeding was observed. (Ex. 408). No injuries to the head or face were noted, contrary to Plaintiff's allegation that Defendants "rammed" his head into the cell gate.

Accordingly, the Court finds that although Defendants used force on Plaintiff on April 30, 2001, Plaintiff has not met his burden to prove that the force was excessive or in violation of Plaintiff's constitutional rights.

## 2. April 18, 2002

This incident took place almost one year after the April 30, 2001 incident. The undisputed facts are that Defendants Dininny, Bubacz, and Potter were in D–Block on April 18, 2002, when they approached Plaintiff's cell with a Plexiglass cart to collect garbage. Plaintiff reached one arm into the cart and refused to bring his arm back into his cell. Plaintiff acknowledged that this action was a violation of the rules. Defendant Potter took control of the hatch until Sergeant Morse spoke with Plaintiff and convinced Plaintiff to bring his arm back into his cell. No use of force reports were completed for this incident. However, the parties dispute whether Defendant Potter used excessive

force on Plaintiff's arm when he was operating the hatch.

### a. Plaintiff's Proof

Plaintiff admits that he refused to come out of his cell for a cell search, and was extracted from his cell on April 18, 2002. Plaintiff claims that after being removed from his cell he did not have supplies like a toothbrush, toilet paper, or soap. According to Plaintiff, when Defendants Dininny and Bubacz came to his cell with a tray to collect garbage, Plaintiff reached his arm through the tray slot and into the cart and asked for toilet paper. Plaintiff claimed that he asked for a supervisor because he needed the supplies. Plaintiff admitted that it was against the rules for him to put his arm up through the feed slot.

Plaintiff testified that Defendant Potter came to Plaintiff's cell and traded places with Defendant Bubacz, so that Defendant Potter was in control of the feed slot door. Plaintiff indicated that he was instructed to take his arm back into his cell, but that he refused to take his arm back into his cell because he wanted toilet paper. Plaintiff testified that Defendant Potter then proceeded to "slam" the door against Plaintiff's arm repeatedly until it was swollen "like a helium balloon." Plaintiff admitted that Defendants Dininny and Bubacz did not personally use force on him.

Plaintiff claimed that he requested medical treatment and use of force photos. Plaintiff testified that a nurse did visit his cell and said that he was okay, and that no use of force photos were taken.

### b. Defendants' Proof

Defendant Dininny testified that he was pushing a cart to collect garbage from the inmate cells, and when he stopped at Plaintiff's cell, Plaintiff reached his arm up through his feed slot and into the cart. According to Defendant Dininny, he, Defendant Bubacz, and Defendant Potter all

gave Plaintiff direct orders to bring his arm back into his cell, but Plaintiff refused to comply until a Sergeant came to speak with him. Defendant Dininny testified that Defendant Potter held the hatch up close to Plaintiff's arm, but that he did not observe any force used on Plaintiff's arm.

Defendant Bubacz testified that he was walking in front of Defendant Dininny with the trash cart and he was the one to open the feed hatch on April 18, 2002. When he attempted to slide the hatch closed after approaching Plaintiff's cell, he realized that Plaintiff still had his arm extended out of the hatch. Defendant Bubacz indicated that Defendant Potter then took control of the hatch because he was more experienced than Defendant Bubacz at the time of the incident. According to Defendant Bubacz, Defendant Potter did not push the hatch door up against Plaintiff's arm. Defendant Bubacz recalled that Sergeant Morse responded and was able to get Plaintiff to bring his arm back into his cell.

Defendant Potter testified that at 1:12 p.m. on April 18, 2002, he, Defendant Dininny, and Defendant Bubacz were collecting meal trays with a Plexiglass cart and that when Plaintiff reached into the cart, he would not move his arm back into his cell. Defendant Potter testified that the three Defendants gave Plaintiff direct orders to remove his arm, but Plaintiff refused to comply. Plaintiff was complaining about supplies and alleging that his rights were being violated. Defendant Potter indicated that he took over control of the hatch on Plaintiff's cell so that the other officers could resume trash pickup. Defendant Potter testified that he held the hatch up to meet Plaintiff's arm, but he did not push the hatch against Plaintiff's arm, and did not intend to create pain to get Plaintiff to move his arm. Sergeant Morse came to talk to Plaintiff and Plaintiff moved his arm back into his cell.

Sergeant Morse testified that, as Sergeant, he was called to respond to the incident. When he arrived at the cellblock, he saw that Plaintiff had one arm reaching out of his feed slot, and that Defendant Potter had the door "cinched" up to Plaintiff's arm. Sergeant Morse did not observe any injury to Plaintiff and was able to get Plaintiff to pull his arm back into his cell.

#### c. Analysis

█ Plaintiff has failed to demonstrate, by a preponderance of the evidence, that Defendants Dininny, Bubacz, or Potter used excessive force in violation of his constitutional rights.

As an initial matter, Plaintiff openly admitted that he violated the rules of the facility when he reached his arm through the feed slot and disobeyed direct orders to pull his arm back into the cell.

Plaintiff argued that Defendant Potter forcibly slammed the hatch door on his arm. Defendant Potter and the other Defendants argued that the hatch door was cinched to meet Plaintiff's arm, but that no force was used against the arm, and that the hatch door was not repeatedly slammed on Plaintiff's arm.

Although Plaintiff testified that his arm swelled up "like a helium balloon," Plaintiff has presented no evidence beyond his own testimony to support this claim.

The videotape of the incident, while not the best quality, does not depict any Defendant pulling back and slamming the hatch door against Plaintiff's arm.

Although Defendant Potter denied applying any force against Plaintiff's arm in an attempt to get him to comply with the direction to remove his arm, the Court does not find this version of events credible. On the other hand, the Court similarly does not credit Plaintiff's claim that

Defendant Potter repeatedly slammed the door against his arm.

In sum, based on a review of the record and testimony, the Court finds that Plaintiff has not demonstrated, by a preponderance of the evidence, that Defendants Dininny, Bubacz, or Potter together or individually violated his constitutional rights through excessive use of force on April 18, 2002. Although the Court does not credit Defendant Potter's testimony that he never pushed the hatch against Plaintiff's arm while attempting to hold the hatch in place, the Court finds that the testimony demonstrates that any force was *de minimis,* and Plaintiff was knowingly violating the rules of the facility and the direct orders of Defendants. The incident simply does not rise to the level of a constitutional violation.

### 3. September 4, 2002

The undisputed facts are that Plaintiff was scheduled for a urinalysis test on the basis of suspicion on September 4, 2002 (Ex. 29), and that when Defendants Mastrantonio, Jr. and Weed began to escort Plaintiff for that testing, force was used on Plaintiff. Aside from these few facts, the parties' versions of the events largely differed in material respects. Plaintiff claimed that Defendant Mastrantonio, Jr. punched Plaintiff in the face and then the officers proceeded to beat and stomp on Plaintiff, even returning for additional blows after Plaintiff was left in the shower. Defendants argued that Plaintiff swung at Defendant Mastrantonio, Jr. with his handcuffs and spit in his face, and was then taken face-first to the floor of his cell, hitting furniture on the way down.

### a. Plaintiff's Proof

Plaintiff testified that he and two other inmates were approached by Defendants Berg and Mastrantonio, Jr. on September 4, 2002, before mealtime and were told that they would be coming out for a urinalysis test. Plaintiff said that he did not use drugs and had not had a urinalysis test at Southport before September of 2002. Plaintiff testified that after dinner, Defendants Berg, Weed, and Mastrantonio, Jr. returned and retrieved one of the other inmates for the urinalysis test before coming to get Plaintiff from his cell.

Plaintiff testified that when he came out of his cell, Defendant Banks was on his left, Defendant Mastrantonio, Jr., was on his right, and Defendant Weed was behind him. Plaintiff testified that Defendants cuffed him in the front and then, without provocation, Defendant Mastrantonio, Jr. punched Plaintiff in the face. Plaintiff testified that Defendants then "rammed" Plaintiff into his cell and started beating him. Plaintiff acknowledged that his face hit the desk in his cell. Plaintiff testified that he was screaming while Defendants were kicking him and stomping on him. Plaintiff testified that Defendant Mastrantonio, Jr. stated "I'm going to give you a reason to sue me, motherfucker."

Plaintiff testified that Defendant Bennett came to the scene with leg irons and applied the leg irons to Plaintiff. Plaintiff testified that he was raised to a standing position while Defendants continued to punch and kick him. According to Plaintiff, Defendants then picked Plaintiff up, took Plaintiff into the hall legs first, dropped his torso, and dragged Plaintiff down the hall to the shower with his shoulder "screeching" on the floor. When they got to the shower, Plaintiff testified that Defendants continued to beat Plaintiff while he was "hollering" that his leg was hurting. Plaintiff testified that Defendants left him in the shower.

Plaintiff claimed that he then spoke to inmate Jonathan Wynn, who was housed in the cell next to the shower, and informed Mr. Wynn that he thought his leg was

broken. At trial, Mr. Wynn testified that he saw Plaintiff taken to the shower next to his cell and then he heard Plaintiff being "stomped" and Plaintiff crying.

According to Plaintiff, Defendants Berg, Weed, Banks, and Mastrantonio Jr. then returned to the shower. Plaintiff claimed that Defendant Mastrantonio, Jr. stomped on Plaintiff's chest, leaving his boot print, and Defendants Banks and Weed were stomping on Plaintiff's ankle telling Plaintiff to beg for them to stop. Plaintiff testified that he was begging and pleading for Defendants to stop, and when they did stop, they took Plaintiff back to his cell and left him there with the leg irons on.

Plaintiff testified that Defendants Bennett and Berg retrieved Plaintiff for his use of force photographs. Plaintiff claimed that he went to an outside hospital on September 5, 2002 for an x-ray, after being treated at Southport by Dr. John Alves. Plaintiff testified that he had a fractured ankle and was placed in a cast for a few weeks.

### b. Defendants' Proof

Defendant Mastrantonio, Jr. testified that he went to Plaintiff's cell on September 4, 2002, accompanied by Defendants Banks and Weed, to take Plaintiff to a urinalysis test. He denied giving Plaintiff any advance warning of the test. Plaintiff was cuffed and the cell door opened, and Defendant Mastrantonio, Jr. testified that Plaintiff stepped out, and when Defendant Mastrantonio, Jr. attempted to put the waist chain on, Plaintiff turned and spit in Defendant Mastrantonio, Jr.'s face while simultaneously attempting to swing the cuffs towards his face. Defendant Mastrantonio, Jr. testified that he and the other officers present then took Plaintiff to the floor inside of his cell. Plaintiff landed face-first on the floor, and Defendant Mastrantonio, Jr. had Plaintiff in a bear hug hold because Plaintiff was thrashing on the ground. Defendant Banks applied the waist chain, Defendant Weed placed leg irons on Plaintiff, and Plaintiff was carried to the shower area. Defendant Mastrantonio, Jr. testified that after leaving Plaintiff in the shower, he did not interact with Plaintiff again on September 4, 2002.

Defendant Weed testified that he, Defendant Mastrantonio, Jr., Defendant Banks, and Defendant Berg were assigned to retrieve inmates on B–Block for urinalysis testing on September 4, 2002. The first inmate was removed from his cell and taken to the end of the gallery, where Defendant Berg stayed with the inmate. At that time, Defendants Weed, Banks, and Mastrantonio, Jr. were the officers removing Plaintiff from his cell. Defendant Weed testified that Plaintiff was cuffed, the door to his cell was open, and when he stepped out, he attempted to spit on and strike Defendant Mastrantonio, Jr. with his handcuffs. Defendant Weed testified that he was standing directly behind Plaintiff, and when he saw this occur he placed his hands on the middle of Plaintiff's back and took him to the floor inside of his cell. He stated that Plaintiff was on the floor face-first and kicking backwards, so the other officers were trying to maintain control of Plaintiff's upper body and apply a waist chain. Defendant Weed stated that he applied leg restraints, and Plaintiff was carried to the shower.

Defendant Bennett testified that he was alerted by the console officer on September 4, 2002 to an altercation. Defendant Bennett responded to Plaintiff's cell, but when he arrived, Plaintiff was subdued and leg restraints were being placed on him. As a result, Defendant Bennett testified, he was in no way involved in the use of force incident itself. However, Defendant Bennett testified that he did assist in escorting Plaintiff for his use of force examination and photos following the incident.

Defendant Bennett indicated that Plaintiff was limping somewhat, but that he was able to walk with some guidance.

Defendant Berg testified that he was at the end of the company watching the inmate who had been released from his cell for urinalysis testing when he witnessed an altercation between Plaintiff and Defendants Mastrantonio, Jr., Weed, and Banks. Defendant Berg secured the inmate that he was watching in a shower cell and went to assist the other officers, but stated that when he arrived Plaintiff was already secured in a shower cell. Defendant Berg testified that he was not involved in the incident, but did escort Plaintiff for his use of force photos.

### c. Analysis

▮ Plaintiff has failed to demonstrate by a preponderance of the evidence that Defendants maliciously used excessive force on September 4, 2002. Plaintiff argued that Defendant Mastrantonio, Jr. punched Plaintiff in the face, initiating the struggle. Defendant Mastrantonio Jr. claimed that Plaintiff spit and swung towards his face, which justified his taking Plaintiff to the floor of the cell.

If Plaintiff did spit on Defendant Mastrantonio, Jr., that alone would justify a use of force to restrain Plaintiff in order to neutralize a threat to the officers. *See Bonet v. Shaw,* 669 F.Supp.2d 300, 305 (W.D.N.Y.2009) (finding use of force justified where inmate-plaintiff committed "the most unsavory act of spitting in the face of one of the officers"); *Lopez v. Reynolds,* 998 F.Supp. 252, 257 (W.D.N.Y.1997) (inmate-plaintiff spitting in the face of an officer "demonstrates a reasonably perceived threat to the maintenance of prison discipline"). Plaintiff denied spitting or swinging at Defendant Mastrantonio, Jr., and questioned why he would take these actions when both parties agreed that nothing was said by Plaintiff or by Defendant Mastrantonio, Jr. before Plaintiff stepped out of his cell.

As for the extent of Plaintiff's injuries, at trial, Dr. Alves reviewed his treatment notes and testified that Plaintiff's injuries were as follows: chest tender at the seventh and eighth ribs; "moderately" swollen and tender ankle; minimal soft tissue swelling above and tenderness below the right eyeball; and abrasions on the chest, shoulder, and right flank. Dr. Alves testified that the night nurse on call during the September 4, 2002 incident called Dr. Alves at home, and Dr. Alves instructed the nurse to make an appointment for Plaintiff to see him in the morning. On September 6, 2002, Dr. Alves noted that an x-ray was negative for any fracture, but that Plaintiff was placed in an air cast for comfort.

Despite Defendants' arguments that Plaintiff did not go to the hospital for an x-ray, medical records from Arnot Ogden Medical Center show that Plaintiff did indeed go to an outpatient facility for an x-ray of his ankle. However, that x-ray did not show that Plaintiff sustained a fracture.

After explaining to the Court in great detail the activities that Plaintiff could no longer do as a result of his left ankle being injured on September 4, 2002, Plaintiff admitted on cross examination that he had broken his left ankle in the late 1990's. Additionally, the x-ray from September 5, 2002 showed that Plaintiff had preexisting bone formations due to a previous injury. As a result, Plaintiff is unable to show that he experiences any lasting injury independent from his preexisting condition.

The use of force photos from September 4, 2002 show swelling in Plaintiff's left ankle, some red marks on Plaintiff's chest and shoulders, and blood/saliva dripping from Plaintiff's nose. (Ex. 14). Nurse Mil-

ler examined Plaintiff following the incident, and recorded swelling in Plaintiff's left ankle as well as superficial abrasions. (Ex. 14).

Although the injuries sustained by Plaintiff are consistent with having suffered a beating, they are also consistent with being taken down to a concrete floor by three correction officers, and hitting a face on a metal desk. It may be that the officers could have used less force than they did. Such use of force, though, does not necessarily establish a constitutional violation.

In the last analysis, the Court does not find either Plaintiff's or Defendants' story as to the events of September 4, 2002 to be entirely credible. Both parties' positions are equally incredible.

However, Plaintiff must prove his case. He must prove by a preponderance of the evidence that the officers used the force that they did, maliciously and sadistically, for the purpose of causing harm and pain and for no legitimate, penological purpose. Plaintiff has failed to carry his burden.

### 4. October 22, 2002

The undisputed evidence shows that Plaintiff was removed from his cell by Defendants Mastrantonio, Jr. and Vandegrift on October 22, 2002, for an escort to a Tier III hearing. After the hearing, the same Defendants were escorting Plaintiff back to his cell when there was an altercation. Plaintiff claimed that Defendant Mastrantonio, Jr. grabbed Plaintiff's leg restraints and pulled Plaintiff's feet out from under him, causing Plaintiff to fall face-first to the floor, and then proceeded to beat Plaintiff. Defendants Mastrantonio, Jr. and Vandegrift claimed that Plaintiff was being verbally abusive and loud, was told to be quiet, turned to spit on Defendant Mastrantonio, Jr.'s chest, and was then taken down and restrained by the officers. Defendant Vandegrift stated

that he was the one to put Plaintiff's legs in a figure four hold.

### a. Plaintiff's Proof

Plaintiff testified that on October 22, 2002, Defendants Mastrantonio, Jr. and Vandegrift approached Plaintiff's cell and took him out of his cell for an escort to a Tier III hearing. Plaintiff claimed that Defendant Mastrantonio, Jr. "threatened" Plaintiff during the escort.

Plaintiff testified that during an adjournment of the hearing, Plaintiff was standing outside the door of the office while Defendant Banks was in the vicinity, "mocking" Plaintiff. According to Plaintiff, at this time Defendant Banks was making faces and calling Plaintiff stupid. Plaintiff returned to the hearing and it was adjourned.

According to Plaintiff, immediately after walking out of the view of the camera, Defendant Mastrantonio, Jr. grabbed Plaintiff's leg irons and pulled back, so that Plaintiff landed face-first on the ground. Plaintiff testified that Defendant Vandegrift placed him in a hold, but was not harming him, while Defendants Mastrantonio, Jr. and Banks were kicking Plaintiff on his body and twisting his legs.

Plaintiff testified that he was seen by Nurse Brandt and his most serious injury was his swollen knee, but that he also had bruising and a headache.

### b. Defendants' Proof

Defendant Mastrantonio, Jr. testified that he escorted Plaintiff to a hearing, stood outside in the hall during the hearing, and then when the hearing was over, he escorted Plaintiff back to his cell. When they entered the gallery, Defendant Mastrantonio, Jr. testified, Plaintiff began yelling, Defendant Mastrantonio, Jr. told him to stop yelling, and Plaintiff turned and spit on Defendant Mastrantonio, Jr.'s

chest. Defendant Mastrantonio, Jr. then took Plaintiff to the floor in a bear hug hold and held him to the floor. Plaintiff was in full restraints and landed face-first. Defendant Vandegrift assisted and Plaintiff was placed in the shower. Defendant Mastrantonio, Jr. indicated that he did not interact with Plaintiff again on October 22, 2002.

Defendant Vandegrift testified that he was a floor officer in B–Block on October 22, 2002, and that he assisted Defendant Mastrantonio, Jr. in escorting Plaintiff to and from a hearing. When they were returning to Plaintiff's cell from the hearing, Defendant Vandegrift testified that he witnessed Plaintiff turn to his right and spit on Defendant Mastrantonio, Jr. At that time, Defendant Vandegrift testified that he grabbed Plaintiff's left arm with his left arm and forced Plaintiff to the floor, then came back on his knees and attempted to control Plaintiff's legs. Defendant Vandegrift testified that he placed Plaintiff in a "figure four lock," whereby he took Plaintiff's left leg and folded it over his right leg, and then took Plaintiff's right leg and forced his right foot toward Plaintiff's lower back.

Defendant Wetzel testified that he was the supervisor of B–Block on October 22, 2002. He witnessed the altercation between Plaintiff and other Defendants on that date, but had no independent recollection of the details of the altercation.

#### c. Analysis

■ Once again, if Plaintiff did spit on Defendant Mastrantonio, Jr., then the use of force to gain control of Plaintiff was justified. Plaintiff failed to demonstrate by a preponderance of the evidence that his version of the events, that Defendant Mastrantonio, Jr. pulled Plaintiff's leg irons out from under him and proceeded to beat him, is the more accurate version of the events. Accordingly, the Court finds against the Plaintiff on this issue.

There are no marks plainly visible in the October 22, 2002 use of force photos. (Ex. 423–26). Nurse Brandt examined Plaintiff at 10:30 a.m. on the date of the incident. (Ex. 427). Plaintiff complained of a sore back, legs, knees, ankles, neck, and testicles. No scratches, bruises, or lacerations were noted, except for a small red area on Plaintiff's right shoulder. Plaintiff had good range of motion in all extremities and was able to bear weight on his ankles. This medical evidence does not suggest that Plaintiff sustained the brutal beating that he claimed.

Plaintiff failed to demonstrate by a preponderance of the evidence that Defendants maliciously used force on Plaintiff with the intent to cause harm, as compared to using force to neutralize an unruly inmate.

After considering all of the evidence, the Court determines that Plaintiff has failed to carry his burden, by a preponderance of the evidence, that Defendants separately or together violated his constitutional rights by using excessive force in any of the alleged incidents. It is clear that some force was used on Plaintiff, but Plaintiff has failed to meet his burden of establishing that the officers acted maliciously and sadistically for the purpose of causing Plaintiff harm and injury.

### C. RETALIATION

Plaintiff also contended that Defendant Peter Mastrantonio, Jr. retaliated against Plaintiff in violation of Plaintiff's First Amendment rights under the United States Constitution.

■ Courts must approach inmate claims of retaliation "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir.2001), *overruled on*

*other grounds,* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). In order to succeed on his retaliation claim against Defendant Mastrantonio, Jr., "[P]laintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in [Defendant's] decision to discipline him." *Lopez,* 998 F.Supp. at 258 (internal quotation omitted). A First Amendment retaliation claim requires that the plaintiff show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009).

■■■ "The filing of formal prisoner grievances is protected conduct under the First Amendment." *Shariff v. Poole,* 689 F.Supp.2d 470, 478 (W.D.N.Y.2010) (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

■■■ "Adverse action," defined objectively, is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.'" *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). "In other words, in the context of prisoner retaliation suits, a prisoner need not demonstrate 'actual chill.' The issue is whether defendants engaged in retaliatory conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his constitutional rights.'" *Lashley v. Wakefield,* 483 F.Supp.2d 297, 300 (W.D.N.Y.2007) (quoting *Gill,* 389 F.3d at 381).

■■■ "This objective inquiry is not static across contexts, but rather must be tai-

lored to the different circumstances in which retaliation claims arise." *Dawes,* 239 F.3d at 493 (internal quotation omitted). "Prisoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis,* 320 F.3d at 353.

Of course, even where a plaintiff who engages in protected speech is subjected to adverse action, the plaintiff must still prove that the adverse action was taken because of the protected speech.

■■■ In evaluating whether a plaintiff has established the necessary causal connection of a retaliation claim, "a court may infer an improper or retaliatory motive in the adverse action from: (1) the temporal proximity of the filing to the grievance and the disciplinary action; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining the plaintiff." *Shariff,* 689 F.Supp.2d at 479.

### 1. Trial Testimony

Plaintiff claimed that Defendant Mastrantonio, Jr. engaged in retaliatory conduct against Plaintiff after Plaintiff filed grievances against Defendant Mastrantonio Jr.'s uncle, Defendant A. Mastrantonio. Plaintiff noted that on May 4, 8, and 17, 2001, he filed internal grievances against Defendant A. Mastrantonio and others related to the April 30, 2001 incident.

According to Plaintiff, on May 26, 2001, Defendant Mastrantonio, Jr. walked by Plaintiff's cell and said "something like 'the Mastrantonios don't be fucked with' that he would get me you know something of that nature." Plaintiff filed a complaint including allegations related to this incident on August 20, 2001. (Ex. 4). Defendant Mastrantonio, Jr. testified that his

uncle did not tell him about the shower incident of April 30, 2001, and he denied any specific knowledge about Plaintiff or the incident on that date.

On May 31, 2001, Defendant Mastrantonio, Jr. filed a misbehavior report stating that Plaintiff had engaged in unhygienic acts and disobeyed the direct order of an officer. (Ex. 9). As a result of this report, Plaintiff was moved to a more secure cell location. Plaintiff claims that the May 31, 2001 misbehavior report filed by Defendant Mastrantonio, Jr. was false and was in retaliation for Plaintiff's grievances against Defendant. On June 8, 2001, Plaintiff filed a grievance concerning the allegedly false misbehavior report. (Ex. 8). Defendant Mastrantonio, Jr. testified that he had no recollection of the misbehavior incident.

On August 15, 2002, Plaintiff served Defendant Mastrantonio, Jr. with a summons and complaint for the underlying matter. (Ex. 37). Plaintiff claimed that Defendant Mastrantonio, Jr. was involved in the September 4, 2002 incident in retaliation for Plaintiff's grievances and legal action against him. Plaintiff testified that Defendant Mastrantonio, Jr. was verbally threatening Plaintiff during the use of force, making statements such as "I'm going to give you a reason to sue me." Defendant Mastrantonio, Jr. testified that he did not have any specific knowledge of Plaintiff prior to the September 4, 2002 incident, and that any force used against Plaintiff was in response to Plaintiff's conduct, not what he had said or grievances he had filed.

Following the September 4, 2002 use of force incident, Plaintiff filed a complaint with the Inspector General's office. Plaintiff claims that Defendant Mastrantonio, Jr.'s use of force on October 22, 2002 was in retaliation for the Inspector General's investigation and other grievances filed by Plaintiff. Defendant Mastrantonio, Jr. testified that any force used against Plaintiff was in response to Plaintiff's misbehavior, and not in retaliation for what Plaintiff had said.

### 2. Analysis

#### a. May 21, 2001 Verbal Threats

Plaintiff has failed to sustain his burden of proof with respect to the May 21, 2001 alleged verbal threats. Plaintiff claimed that Defendant Mastrantonio, Jr. walked by Plaintiff's cell and said "something like 'the Mastrantonios don't be fucked with' that he would get me you know something of that nature." However, Plaintiff's testimony about this alleged threat lacked clarity and was vague. In view of Plaintiff's vague testimony, coupled with Defendant Mastrantonio, Jr.'s denial of knowledge of the grievances concerning the April 30, 2001 incident, the Court finds that there is insufficient evidence that a threat was made.

Moreover, even if Defendant Mastrantonio, Jr. had made these verbal threats to Plaintiff on May 21, 2001, the verbal threats alleged by Plaintiff do not constitute an adverse action sufficient to support a retaliation claim.

"[S]ome verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute adverse action.... But not all do. The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." *Mateo v. Fischer*, 682 F.Supp.2d 423, 434 (S.D.N.Y.2010). Plaintiff did not recall what specifically was said by Defendant Mastrantonio, Jr., but Plaintiff stated that it involved a threat that Defendant would "get" Plaintiff. This general threat is not specific enough to constitute an adverse action. *See Kemp v. LeClaire*, No. 03–0844S, 2007 WL 776416, at *15 (W.D.N.Y. Mar. 12, 2007) (state-

ments like "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" not adverse actions). *Cf. Ford v. Palmer*, 539 Fed.Appx. 5, 6 (2d Cir.2013) (direct threat to poison inmate-plaintiff constituted an adverse action).

Further, Plaintiff has claimed, but has failed to demonstrate, any retaliatory animus by Defendant Mastrantonio, Jr. to motivate his making the alleged statements. Indeed, Defendant Mastrantonio, Jr. testified that his uncle did not inform him of the shower incident or of Plaintiff's grievances against Defendant A. Mastrantonio. The evidence does not demonstrate that Defendant Mastrantonio, Jr. had knowledge of Plaintiff's protected conduct related to the April 30, 2001 incident.

Accordingly, Plaintiff has failed to demonstrate, by a preponderance of the evidence, that Defendant Mastrantonio, Jr. engaged in retaliatory conduct by making verbal threats on May 21, 2001.

### b. May 30, 2001 Misbehavior Report

 Plaintiff has also failed to sustain his burden of proof with respect to the May 30, 2001 misbehavior report.

Plaintiff was engaged in a protected activity when he filed grievances against A. Mastrantonio on May 4, 8, and 17, 2001. Plaintiff has not sufficiently demonstrated that he suffered a retaliatory adverse action as a result of these grievances.

Plaintiff claimed that he suffered an adverse action because he alleged that the May 30, 2001 misbehavior report was false, and because the report resulted in Plaintiff being relocated to another cell and assigned additional SHU time.

The misbehavior report states that, during recreational time, Plaintiff made profane sexual threats towards Defendant and disobeyed a direct order to cease making such threats. (Ex. 9). Plaintiff denied

threatening Defendant Mastrantonio, Jr. during recreational time.

Filing a false misbehavior report is an adverse action for purposes of a retaliation analysis. *Gill*, 389 F.3d at 384. However, Plaintiff has failed to demonstrate by a preponderance of the evidence that the misbehavior report was false. Particularly in light of Plaintiff's extensive disciplinary history, which Plaintiff himself placed into evidence at trial, and which includes numerous instances of making threats towards other officers (Ex. 7), Plaintiff's testimony that this particular misbehavior report was false or in retaliation is not credible.

As for being assigned to SHU, Plaintiff admitted at trial that he had already maxed out his SHU time at the time of the incidents at Southport, and that therefore any additional SHU assignment did not impact Plaintiff.

Plaintiff has demonstrated temporal proximity between his grievances filed in early—to mid-May and the misbehavior report issued on May 30, 2001. However, this temporal proximity is not enough to convince the Court that there was a causal connection between the filing of Plaintiff's grievances and the misbehavior report. The Court finds Defendant Mastrantonio, Jr.'s testimony that he drafted the misbehavior report in response to Plaintiff's conduct to be more credible than Plaintiff's testimony that he did not threaten Defendant on May 30, 2001.

In sum, Plaintiff failed to establish, by a preponderance of the evidence, that he suffered a retaliatory adverse action on May 30, 2001.

### c. September 4, 2002 and October 22, 2002 Uses of Force

Plaintiff was engaged in a protected activity when he filed a federal lawsuit naming Defendant Mastrantonio, Jr. and filed

grievances against Defendant Mastrantonio, Jr. Plaintiff was also engaged in protected activity when he requested that the Inspector General investigate the September 4, 2002 incident.

Although force was used against Plaintiff on September 4, 2002 and October 22, 2002, the Court has determined that Plaintiff failed to prove by the preponderance of the evidence that these uses of force were excessive. Accordingly, it is not evident that Plaintiff suffered adverse actions through Defendant Mastrantonio Jr.'s uses of force against Plaintiff on September 4, 2002 and October 22, 2002.

Even if Plaintiff had suffered adverse actions, he has failed to demonstrate that there was a causal connection to link his protected activities and the adverse actions.

As to the September 4, 2002 incident, Plaintiff sufficiently demonstrated temporal proximity between his June 8, 2001 grievance, August 15, 2002 service of the original complaint in the underlying lawsuit, and the September 4, 2002 use of force. As to the October 22, 2002 incident, Plaintiff sufficiently demonstrated temporal proximity between his grievances related to the September 4, 2002 incident, the resulting Inspector General report, and the October 22, 2002 incident itself. However, this showing of temporal proximity alone is not enough to convince the Court that Defendant Mastrantonio Jr.'s conduct on September 4, 2002 or October 22, 2002 was based on a retaliatory motive, particularly in view of the Court's significant questions concerning the credibility of Plaintiff's version of events, as detailed above.

In sum, the Court finds that Plaintiff has failed to prove by a preponderance of the evidence that Defendants acted with any improper motive, engaged in retaliatory conduct, or that there was a causal connection between his protected activity and the alleged retaliatory conduct, and Plaintiff's retaliation claim is dismissed.

## V. DEFENDANTS' RULE 52(c) MOTION FOR JUDGMENT ON PARTIAL FINDINGS

Under a Rule 52(c) motion for judgment on partial findings, Defendants argued, *inter alia*, that certain Defendants should be dismissed from the case due to Plaintiff's failure to establish that these individuals were in any way involved in the underlying claims. For example, Defendants noted that Plaintiff failed to even mention in his direct case how Defendant Raub was associated with the underlying events. In response, Plaintiff argued that he did not explicitly discuss each individual Defendant in his direct case but that he relied on his complaint, which does explicitly describe how each named Defendant is allegedly involved. At any rate, the Court does not need to take the time to parse out the individual Defendants who do or do not belong in this lawsuit. Given the Court's finding in favor of the Defendants as to all claims, Defendant's Rule 52(c) motion is denied as moot.

On the fourth day of trial, in the middle of Defendants' case, Plaintiff also made a Rule 52(c) motion. This motion is denied.

## VI. CONCLUSION

Based on the above, the Court finds NO CAUSE OF ACTION for relief and directs the Clerk of the Court to enter a judgment in favor of all Defendants on the docket of this Court and dismiss Plaintiff's complaint.

SO ORDERED.